# 24-1162-cv(L),
## 24-1159(CON), 24-1161(CON), 24-1166(CON), 24-1173(CON), 24-1177(CON), 24-1178(CON)

# United States Court of Appeals
### *for the*
# Second Circuit

IN RE: ARCHEGOS 20A LITIGATION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLANT
## ALEXANDER SHAPOVALOV

MICHAEL I. FISTEL, JR.
  (*pro hac vice*)
JOHNSON FISTEL, LLP
*Attorneys for Plaintiff-Appellant*
  *Alexander Shapovalov*
40 Powder Springs Street
Marietta, Georgia 30064
(470) 632-6000

CP COUNSEL PRESS    (800) 4-APPEAL • (330472)

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .......................................................................1

ISSUES PRESENTED.......................................................................................1

STANDARD OF REVIEW ................................................................................2

STATEMENT OF CASE ...................................................................................2

SUMMARY OF FACTS ....................................................................................4

I.    ARCHEGOS RELIED ON DEFENDANTS TO FACILITATE ITS
MANIPULATIVE TRADING PRACTICES ...................................................4

    A.    Archegos's Founding Was Premised on Sun Kook (Bill) Hwang's
History of Deceit and Market Manipulation .........................................4

    B.    Defendants' Prime Brokerage Relationship with Archegos ................4

    C.    Archegos Received Personal Benefits from Tipping MNPI and
Defendants Secured Exorbitant Fees in a *Quid Pro Quo*....................8

II.    DEFENDANTS AIDED ARCHEGOS IN DEVELOPING MASSIVE
POSITIONS IN THE ISSUERS' STOCK BEGINNING IN 2020 THAT
MADE ARCHEGOS AN INSIDER OF THE ISSUERS ...........................12

    A.    In 2020 and 2021, Archegos Amassed Highly Leveraged
Non-Public Positions in Several Mid-to-Small Cap Companies ........12

    B.    Archegos Sought Personal Benefits from Tipping MNPI to
Defendants During the Week of March 22, 2021, and Expected
Defendants to Trade on that MNPI .....................................................14

III.    TO MITIGATE THE FALLOUT FROM ARCHEGOS'S COLLAPSE,
DEFENDANTS TRADED ON AND EXPLOITED THE MNPI THEY
RECEIVED FROM ARCHEGOS ............................................................16

    A.    As Archegos's Prime Brokers, Defendants Had a Duty of
Confidentiality to Archegos ...............................................................16

    B.    During the Week of March 22, 2021 Defendants Unloaded Their
Proprietary Shares Without Archegos's Knowledge and Tipped
Clients to Do the Same .......................................................................17

    C.    Defendants Exploited Archegos's MNPI by Tipping Off Clients
Ahead of Archegos's Collapse Becoming Public ...............................19

IV.    DEFENDANTS MITIGATED THEIR LOSSES AT THE EXPENSE
OF ORDINARY INVESTORS AND THE CLASS ...................................20

V.     TESTIMONY AT HWANG'S CRIMINAL TRIAL HIGHLIGHTED DEFENDANTS' RECEIPT OF MNPI AND FRONT-RUNNING ............21

PROCEDURAL HISTORY.................................................................22

SUMMARY OF ARGUMENT ...........................................................26

ARGUMENT .....................................................................................27

I.     THE DISTRICT COURT ERRED IN HOLDING THAT THE DEFENDANTS ARE NOT LIABLE FOR INSIDER TRADING UNDER THE "TIPPER/TIPPEE" THEORY ................................30

     A.     The District Court's Constrictive Redefinition of MNPI Is Contrary to Law...............................................................32

     B.     The District Court Erroneously Conditioned Insider Status on Actual Access to Its Own Threshold Mis-Definition of MNPI .........43

II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE DEFENDANTS ARE NOT LIABLE FOR INSIDER TRADING UNDER THE "MISAPPROPRIATION" THEORY ...................................50

     A.     Defendants Misappropriated and Traded Using Archegos's MNPI...50

     B.     Defendants Are Liable as Tippers for Sharing Archegos's MNPI with Customers Who Subsequently Traded.........................................54

III.   THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' CLAIMS UNDER §§20A AND 20(a) .........................................58

CONCLUSION ..................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.T. Brod & Co. v. Perlow*,
  375 F.2d 393 (2d Cir. 1967)....................................................................49

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .......................................................... 55, 58

*City of Providence v. Bats Glob. Mkts, Inc.*,
  878 F.3d 36 (2d Cir. 2017)........................................................................2

*Crane Co. v. Westinghouse Air Brake Co.*,
  419 F.2d 787 (2d Cir. 1969)........................................................... 34, 47

*Dirks v. SEC*,
  463 U.S. 646 (1983) ............................................................... 35, 37, 38

*Donoghue v. Hearst Commc's, Inc.*,
  355 Fed. App'x 520 (2d Cir. 2009) ...................................................45

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
  423 U.S. 232 (1976) ..................................................................... 45-46

*Gruber v. Gilbertson*,
  No. 16CV9727, 2021 WL 2482109 (S.D.N.Y. Mar. 20, 2018) ................... 47, 48

*Hallwood Realty Partners, L.P. v. Gotham Partners*, L.P.,
  286 F.3d 613 (2d Cir. 2002).................................................................48

*Hamilton v. Dallas Cnty.*,
  79 F.4th 494 (5th Cir. 2023) ................................................................41

*In re Matter of Oppenheimer & Co.*,
  SEC Release No. 508, 1976 WL 160384 (SEC Apr. 2,1976) .......... 34, 35, 36, 44

*In re Pretium Res. Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017),
  *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) ...........55

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)..................................................................57

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)....................................................................58

*Iwa Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ............................................................ 53, 57

*Jacques v. U.S. R.R. Ret. Bd.*,
736 F.2d 34 (2d Cir.1984).....................................................................21

*Levy v. Southbrook Int'l, Invs., Ltd.*,
263 F.3d 10 (2d Cir. 2001)....................................................................45

*Martin v. Quartermain*,
732 Fed. App'x 37 (2d Cir. 2018)........................................................55

*Matarese v. Aero-Chatillon Corp.*,
No. 68 CIV. 4451, 1971 WL 312 (S.D.N.Y. Dec. 22, 1971) ..............38

*Puddu v. 6D Glob. Techs., Inc.*,
No. 15-CV-8061, 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021).......48

*Reed v. Riddle Airlines*,
266 F.2d 314 (5th Cir. 1959) ...............................................................37

*Rogen v. Ilikon Corp.*,
361 F.2d 260 (1st Cir. 1966)................................................................38

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)............................................................ 55, 56

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)...................................................................55

*Salman v. United States*,
580 U.S. 39 (2016)................................................................................30

*SEC v. Afriyie*,
No. 16-CV-2777 (JSR), 2018 WL 6991097
(S.D.N.Y. Nov. 26, 2018)......................................................................56

*SEC v. Ayoub*,
SEC Litig. Rel. No. 7416 (S.D.N.Y. May 27, 1976),
9 SEC Docket 756 (1976)......................................................................36

*SEC v. Ayoub*,
SEC Litig. Rel. No. 7493 (S.D.N.Y. July 21, 1976),
10 SEC Docket 86 (1976)......................................................................36

*SEC v. Dorozhko*,
574 F.3d 42 (2d Cir. 2009).............................................................. 27, 49

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997)....................................................................42

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012)........................................................ 28, 50

*SEC v. Panuwat*,
    No. 21-CV-06322, 2022 WL 633306 (N.D. Cal. Jan. 14, 2022)........................42

*SEC v. Panuwat*,
    No. 21-CV-06322-WHO, 2023 WL 9375861 (N.D. Cal. Nov. 20, 2023) .........40

*SEC v. Primar Typographers, Inc*,
    SEC Litig. Rel. No. 7580 (S.D.N.Y. Sept 27, 1976),
    10 SEC Docket 626 (1976) ................................................................36

*SEC v. Sorg Printing Co., Inc.*,
    No. 74 CIV. 3634, 1975 WL 368 (S.D.N.Y. Mar. 28, 1975) ............................36

*SEC v. Suman*,
    684 F. Supp. 2d 378 (S.D.N.Y. 2010),
    *aff'd*, 421 F. App'x 86 (2d Cir. 2011)......................................................51

*SEC v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ........................................................48

*Sexton v. Panel Processing, Inc.*,
    754 F.3d 332 (6th Cir. 2014) ................................................................39

*Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co.*,
    404 U.S. 6 (1971)................................................................................49

*Threat v. City of Cleveland*,
    6 F.4th 672 (6th Cir. 2021) ................................................................39

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) ................................................................30

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987) ...................... 35, 39, 40

*United States v. Chiarella*,
    588 F.2d 1358 (2d Cir. 1978),
    *rev'd on other grounds*, 445 U.S. 222 (1980)............................................ *passim*

*United States v. Martoma*,
    894 F.3d 64 (2d Cir. 2017)........................................................... 39, 40

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ................................................................ 35, 37

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (2018) ...................................................... 38, 39

*Veleron Holding, B.V. v. Morgan Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015) ............................................41

*Werner v. Werner*,
   267 F.3d 288 (3d Cir. 2001)........................................................21

*Young v. Selsky*,
   41 F.3d 47 (2d Cir. 1994)............................................................21

**Statutes & Other Authorities:**

15 U.S.C. § 78aa ..............................................................................1

15 U.S.C. § 78j(b) .................................................................. *passim*

15 U.S.C. § 78t(a) ..................................................... 1, 22, 58

15 U.S.C. § 78tA ....................................................... 1, 22, 48, 58

17 C.F.R. § 240.10b-5.............................................................. *passim*

17 C.F.R. § 240.10b5-1(a) .......................................... 27, 32, 33, 42

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1331 .............................................................................1

Arthur Fleischer *et al., An Initial Inquiry Into the Responsibility to Disclose
   Market Information*,
   121 U. Pa. L. Rev. 798 (1973) ...................................................37

Fed. R. Civ. P. 12(b)(6).....................................................................2

H.R. Rep. No. 98-355 (1983)...........................................................38

Press Release, Sec. & Exch. Comm'n, SEC Charges Morgan Stanley and
   Former Executive Pawan Passi with Fraud in Block Trading Business
   (Jan. 12, 2024)..............................................................................20

Victor Brudney, *Insiders, Outsiders, and Informational Advantages
   Under the Federal Securities Laws*,
   93 Harv. L. Rev. 322 (1979) ......................................................37

# JURISDICTIONAL STATEMENT

Each of these seven coordinated securities-fraud class actions arises under §§10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78tA and 78t(a), and Rule 10b-5 promulgated by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5. The district court had original federal question jurisdiction under Exchange Act §27 (15 U.S.C. §78aa) and 28 U.S.C. §1331. On April 1, 2024, the district court dismissed all claims against the defendants with prejudice. SPA23-41 ("Second Dismissal Order"). That final judgment gave this Court jurisdiction under 28 U.S.C. §1291. Plaintiffs timely appealed. A409-506.

# ISSUES PRESENTED

1.  Whether the district court properly dismissed Plaintiffs' §10(b) tipper/tippee claims on an unprecedented redefinition of the term "material nonpublic information," which erroneously limited the term to internal corporate information sourced from the corporation itself?

2.  Whether the district court properly dismissed Plaintiffs' §10(b) tipper/tippee claims by conditioning a controlling shareholder's status as insider on actual access to a narrow category of internal corporate information encompassed by the district court's erroneous redefinition of material nonpublic information?

3.  Whether the district court properly dismissed Plaintiffs' §10(b) misappropriation claims by misconstruing the alleged facts, applying impossibly high pleading standards, and improperly drawing inferences against Plaintiffs?

4.  Whether the district court properly dismissed Plaintiffs' §§20A and 20(a) claims for lack of a predicate §10(b) claim?

1

## STANDARD OF REVIEW

This Court reviews a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) "*de novo*, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the non-moving party." *City of Providence v. Bats Glob. Mkts, Inc.*, 878 F.3d 36, 48 (2d Cir. 2017).[1]

## STATEMENT OF CASE

These coordinated actions allege illicit front-running trades and tips by Defendants Morgan Stanley and Goldman Sachs Group, Inc. ("Goldman Sachs") ahead of the late March 2021 collapse of a massive market manipulation scheme orchestrated by their client Archegos Capital Management ("Archegos"). Defendants were prime brokers who, by supplying total return swaps ("TRS") and other services, provided the financing and anonymity that Archegos needed to surreptitiously acquire massive beneficial ownership of and control over the seven issuers that are the subject of the Archegos cases - Gaotu Techedu Inc., formerly known as GSX Techedu Inc., ("Gaotu"), Vipshop Holdings Ltd. ("Vipshop"), Tencent Music Entertainment Group ("Tencent"), ViacomCBS, Inc. ("ViacomCBS"), IQIYI, Inc. ("IQIYI"), Baidu, Inc. ("Baidu"), and Discovery, Inc. ("Discovery"; collectively, the "Issuers"). To secure those services, from which it

---

[1]  Unless otherwise indicated, citations are omitted and emphasis is added.

personally benefitted, Archegos paid Defendants lofty fees and provided them with an array of material nonpublic information ("MNPI") – *i.e.*, Archegos's undisclosed, massive beneficial ownership stakes across the Issuers, and that these stakes were built by a TRS trading scheme meant to manipulate the market and evade securities laws. In late March 2021, Archegos provided the additional MNPI that it faced (yet was unable to cover) billions of dollars in escalating margin calls from counterparties, and was about to implode and bring the Issuers' stock down with it. Archegos provided this MNPI to seek controlled and coordinated sales of Archegos's posted collateral by Defendants and the other prime brokers, which would benefit it financially, and benefit the prime brokers with higher prices than they would achieve in a fire sale. But before the truth of Archegos's nonpublic controlling positions and impending collapse reached the public, Defendants exploited all the MNPI, in breach of duties owed both to the Issuers and to Archegos, and, far beyond Archegos's expectations, unloaded billions of dollars of their own proprietary holdings (and tipped preferred clients to do the same).

## SUMMARY OF FACTS

### I.   ARCHEGOS RELIED ON DEFENDANTS TO FACILITATE ITS MANIPULATIVE TRADING PRACTICES

#### A.   Archegos's Founding Was Premised on Sun Kook (Bill) Hwang's History of Deceit and Market Manipulation

Sung Kook (Bill) Hwang ("Hwang"), the head of Archegos, founded a hedge fund known as Tiger Asia, which grew to over $5 billion.  A299.  Hwang, however, was soon banned from managing money on behalf of clients via a settlement with the SEC in 2012, which also involved a penalty payment of $44 million by Tiger Asia, and then a guilty plea with the DOJ in 2013 for crimes arising out of the same conduct.  *Id*.

Because Hwang could no longer manage investor capital, he converted Tiger Asia into a family company in approximately 2013, named Archegos.  A299-301.  Archegos operated under the SEC Family Office Rule and was thus exempt from regulatory oversight and not subject to SEC examination or reporting.  *Id*.  Despite its "Family Office" status, Archegos operated as a sophisticated hedge fund, employing more than 50 employees who participated in compliance training.  A300.

#### B.   Defendants' Prime Brokerage Relationship with Archegos

Archegos relied on prime brokers – including Defendants – to provide prime brokerage services.  A301.  In particular, Archegos participated in three types of unique trading and investing which were facilitated by Defendants.  *Id*.

4

**Total Return Swaps (TRS)** – A total return swap, or TRS, is a derivative contract under which the client acquires the beneficial ownership of an asset without directly purchasing it. A301-03. A TRS contract entitles the client to receive payments equivalent to the total return on a reference asset, such as a given number of shares of a particular company's stock, in exchange for paying certain fees to the counterparty providing the TRS. *Id*. A client may also make certain payments to the counterparty that function like interest payments. *Id*. If the value of the reference asset increases, then the payments the client receives will increase correspondingly, but if the value of the reference asset decreases, then the client will receive smaller payments or may be required to make payments to the counterparty. *Id*. The client also must provide the counterparty with some amount of collateral or margin corresponding to a certain amount of the reference asset to protect the counterparty against the risk that it will not make its payments. *Id*. Thus, a client entering into a TRS gets the benefit of any price increases in the underlying assets, and pays for any decreases, just as it would if it directly owned those assets. *Id*.

Upon opening these TRS positions with Defendants, Defendants learned of Archegos's existing common stock and ADR holdings in the underlying Issuers. *Id*. Therefore, Defendants knew that after Archegos had "approached 5% ownership of all outstanding stock of the security," Archegos would then "shift[] from purchasing cash equity positions in that issuer to purchasing additional synthetic exposure to the

5

issuer through a TRS" as facilitated by Defendants. A317-18. Archegos's undisclosed stakes were concentrated, highly leveraged, and far exceeded the beneficial ownership thresholds to render Archegos a beneficial owner of each Issuer. A317-25, A330-33. So, with Defendants' knowing enablement, Archegos structured these undisclosed positions as a scheme to evade the beneficial reporting requirement of the Exchange Act. *Id.*

**Margin Lending** – Another core prime brokerage service, whereby prime brokers lend clients capital to purchase stock, swaps, and other securities, and then hold some percentage of the value of the asset as "collateral." A304. The collateral can be cash, securities, or other consideration posted by a client taking out loans. *Id.* In a margin lending arrangement, the prime broker lends a client capital to purchase stock and then holds the client's posted collateral to protect the loan. The loan from the prime broker covers up to a specified percentage of the stock's cost, while the remainder of the cost – the "margin" – is paid by the client and serves as further protection for the prime broker. *Id.* The amount of the loan provided by the prime broker is calculated based on factors including counterparty risk and total portfolio risk. The prime broker earns revenue in the form of fees or interest payments, and the client gains exposure to financial instruments valued significantly higher than its posted capital. *Id.* Archegos acquired massive positions in the Issuers on margin through its prime brokers, including Defendants. *Id.*

6

**Block Trading –** Block trading allows large investors, willing to pay a premium for discretion, to engage prime brokers like Defendants to privately execute massive trades quickly and quietly, in order to avoid the panic, publicity, and reactionary market declines that large, public sales often spark. A305. If a client wishes to execute a block sale, a prime broker will seek to arrange a counterparty or group of counterparties for that sale, though the prime broker may acquire the stock itself first, serving as a middleman between the buyers and sellers. *Id.* Block trading is one of the few remaining areas wherein deals are still governed by personal relationships, and the acquiring funds are often parties with whom the banks have preexisting business ties. *Id.* Prime brokers typically charge a fee for executing a block trade and can profit on the spread between the discounted price at which they buy the block of stock from the client and the resale price. *Id.* Defendants are among the top block trade providers. Both Defendants executed block trades when Archegos collapsed during the week of March 22, 2021. *Id.*

As prime brokers for Archegos, Defendants serviced Archegos's trades and lending capital through margin accounts, acting as counterparties on derivative TRS agreements. A288. These financial instruments enabled Archegos to acquire large, highly leveraged non-public, controlling positions in each of the Issuers. *Id.*

**C.   Archegos Received Personal Benefits from Tipping MNPI and Defendants Secured Exorbitant Fees in a *Quid Pro Quo***

Archegos's market manipulation scheme depended on two key elements supplied through Defendants' prime brokerage services: liquidity and anonymity. A446. To secure Defendants' services, from which it personally benefitted, Archegos provided Defendants with an array of MNPI – *i.e.*, Archegos's undisclosed, massive beneficial ownership stakes across all of the Issuers, that these stakes were built by a TRS trading scheme meant to manipulate the market, and later their impending collapse. A443.

Defendants obtained the MNPI regarding Archegos's overall control of the Issuers' stock when they supplied Archegos with billions of dollars of TRS and other transactions to Archegos across the small number of Issuer stocks. A447. This gave Defendants the flexibility to assess what fees to charge and what margin to extend on those transactions and was especially important for clients like Archegos that admitted to employing no formal risk controls. *Id*. As Defendant Goldman Sachs acknowledged when discussing Archegos's collapse in April 2021, "[w]e have robust risk management that governs the amount of finance we provide for these types of portfolios . . . *in tracking concentration and correlation*, we adjust what it is that we're doing, the level of margin we take, the clients we take in, the pricing we put against that prime." *Id*. (emphasis in original). Another prime broker for Archegos admitted that as part of industry-standard vetting, Archegos routinely

provided the MNPI that its holdings of the Issuer stocks were similar across each of its other prime brokers and that its holdings in individual stocks could be well over the disclosure thresholds. *Id.*

Archegos received an array of personal benefits by tipping MNPI to Defendants regarding its enormous, precarious positions in the Issuers' stock and its ability to manipulate the Issuers' stock prices. A449-51. Archegos's scheme depended on remaining in the good graces of Defendants (and other counterparties) who provided the critical and confidential services on which its scheme depended. By providing these discreet services, Defendants enabled the financing capacity and anonymity for Archegos's massive market manipulation scheme. A346-48.

That Defendants provided Archegos with the tools to evade SEC disclosure requirements was critical to the maintenance of Archegos's scheme. *Id.* Public disclosure of its positions would have undermined Archegos's ability to control the Issuers' stocks by inducing short-sellers, regulatory scrutiny, and other impediments thereto. A447. It is now apparent that Defendants' 13F Reports from the second half of 2020 reflected the size of Archegos's frenzied purchases during that time. *Id.* Defendants' role in the scheme and supply of TRS thus allowed Archegos to subvert the SEC's disclosure requirements. *Id.*

Archegos benefitted from the additional liquidity and access to additional trading capacity that Defendants provided. A446. As the size of Archegos's scheme

expanded, it began to approach the limits of its swap counterparties' risk management tolerances, and certain counterparties refused to allow Archegos to execute additional long TRS positions in concentrated names; others refused to allow such transactions without the positing of additional margin. A338, A346.

In response, Archegos engaged in an unrelenting search for additional trade capacity in its concentrated positions to maintain its manipulation scheme and inflated prices. A346. To that end, Archegos spoke daily with Defendants about increasing its notional limits in the Issuers' securities, who repeatedly agreed to grant Archegos additional capacity, including long TRS positions. *Id*. Defendants and prime brokers supplied Archegos with the tens of billions of dollars of debt financing, primarily through TRS transactions and margin lending, it needed to make those purchases and gain control of the Issuers' stock. A446. This drove Archegos's leverage ratio to dangerous levels and added further risk by concentrating its portfolio in the Issuers' stock. *Id*.

Archegos also leveraged the reputational and other non-pecuniary benefits of its relationships with Defendants – both powerful financial institutions – in order to access additional prime brokerage capacity. These benefits we particularly valuable given Hwang's securities fraud convictions. A444. Archegos's market manipulation scheme was entirely dependent on the Defendants continuing to provide Archegos prime brokerage services, and Archegos being able to leverage

the lending capacity of Defendants. *Id*. Archegos, a family office with only $1.5 billion of assets under management before the scheme started, could not have amassed its beneficial ownership positions across the Issuers without Defendants.

Despite Hwang's and Archegos's marred reputation and well-documented history of illegal and manipulative trading, Defendants defied their compliance departments and served as Archegos's prime brokers, because the facilitation of Archegos's market manipulation scheme proved extremely lucrative, since it required Archegos to engage in an unusually large amount of transactions, and thus fees for Defendants. A307-08. As the *Financial Times* wrote in late March 2021, "fee-hungry investment banks were ravenous for Hwang's trading commissions and desperate to lend him money so he could magnify his bets." *Id*.

The arrangement between Defendants and Archegos became even more lucrative for Defendants in the early months of 2021 as Archegos's positions became riskier and riskier and it undertook more and more transactions that were atypical for investment firms and the Issuers' stocks continued to have price movements that were inconsistent with other market movements. A295-96, A331-32. Rather than stop Archegos's trading (and cut-off their own fees) as the risks increased, Defendants increased Archegos's margin requirements and similar terms, making transactions more expensive for Archegos. A295-96.

II.  **DEFENDANTS AIDED ARCHEGOS IN DEVELOPING MASSIVE POSITIONS IN THE ISSUERS' STOCK BEGINNING IN 2020 THAT MADE ARCHEGOS AN INSIDER OF THE ISSUERS**

A.  **In 2020 and 2021, Archegos Amassed Highly Leveraged Non-Public Positions in Several Mid-to-Small Cap Companies**

Prior to 2020, Archegos largely traded in large mega-cap blue chip stocks, like Amazon and Microsoft. This approach resulted in significant losses for the firm in early 2020 at the outset of the COVID-19 pandemic. A313. So, in 2020, with the help of Defendants, Archegos pivoted to a new investment "strategy," whereby it anonymously acquired a massive amount of stock in several small to mid-cap companies, including the Issuers. A313-14. Archegos continued to double-down on this "strategy" over the course of 2020 and early 2021, with its Issuer holdings coming to account for the vast bulk of its portfolio by March 2021. A314-17.

By acquiring these massive positions, Archegos became a controlling insider of each of the Issuers. Because Archegos acquired the Issuers' stock indirectly through TRS and other transactions, Archegos never filed any 13F Reports publicly revealing its large positions, despite its beneficial ownership of the Issuers' stock far exceeding disclosure thresholds. A318, A447. By March 2021, Archegos beneficially owned 30% to 70% of Issuers' stock. A314-15. During the course of Defendants' prime brokerage relationship with Archegos, Defendants became privy to MNPI showing that Archegos traded in the Issuers' stock on an almost daily basis for extended periods, regularly made trades accounting for more than 20% of the

volume for those stocks in a given day, and traded at times that would have the largest price impact on those stocks. A321-27. This was all highly anomalous activity that for sophisticated parties like Defendants was a clear indication that Archegos was engaging in price manipulation. A448.

The increase in size of Archegos's exposures to these companies allowed it to assert a dominant market position over the Issuers' stock and stock price. A314. Archegos's transactions were responsible for dramatically driving up the Issuers' stock prices in a short time, and a drop in the price of any one of those stocks could cause all of them to crater by requiring Archegos to unwind all of its risky positions. A320. Apart from Defendants and a few other prime brokers, no one else knew that a single investor, Archegos, controlled massive amounts of stock in several companies or that it achieved this control through highly-levered transactions. *Id*.

The exposure and risk posed by Archegos's massive and highly leveraged, but non-public positions, drastically increased during the early months of 2021. A288. As was later detailed across an array of criminal indictments, guilty pleas, and regulatory enforcement actions, Archegos (with Defendants' help) built undisclosed, massive, highly leveraged positions by means of tell-tale "market manipulation and fraud, with far-reaching consequences for other participants in the United States securities markets," particularly for ordinary investors in the "companies whose stock prices [Archegos] manipulated," *i.e.*, the Issuers. A289.

13

**B.** **Archegos Sought Personal Benefits from Tipping MNPI to Defendants During the Week of March 22, 2021, and Expected Defendants to Trade on that MNPI**

After months of escalating margin calls from investment banks beginning in January 2021, Archegos's scheme finally unraveled during the week of March 22, 2021. A291, A296, A332. During that week, Archegos revealed that it did not have the funds to meet any of its margin calls. On several conference calls with its prime brokers, in which Defendants participated, Archegos tipped MNPI to Defendants regarding its inability to meet its brokers' escalating margin calls with the expectation that Defendants would trade on that information by undertaking a controlled and coordinated sale of Archegos's collateral holdings of the Issuers' stock. A339-45. Specifically, Archegos sought to benefit from: "delay or avoid[ance of] notices of default, to increase the likelihood of an organized winddown among its Counterparties, and otherwise delay or mitigate the negative financial, regulatory, and reputational fallout and consequences of its collapsing market manipulation scheme," and a "standstill agreement" whereby all prime brokers "would agree not to declare Archegos in default while it wound down its positions in an orderly manner." A343, A347. In other words, Archegos provided the MNPI regarding its imminent collapse to Defendants because, as it explained during a series of conference calls with its prime brokers during the week of March 22, 2021, it sought to **_personally benefit from a controlled sale_** under which

14

it directed the liquidation of its Issuers' stock collateral across all prime brokers to best preserve their value, which would spare Archegos additional financial and reputational harm. A450.

In connection with Archegos's disclosure to Defendants of MNPI, Archegos expected, or should have expected, that Defendants would trade on it. A348. Defendants Morgan Stanley and Goldman Sachs are among the largest investment banks in the world. *Id.* Nearly every aspect of Defendants' businesses involves trading securities. *Id.* Moreover, the prime brokerage and block trading services that Defendants provided in confidence to Archegos necessarily involved trading of certain types of collateral securities for Archegos, including for Archegos to satisfy its obligations to Defendants. *Id.*

Archegos also understood that industry practice for the TRS strategy it employed typically involved Defendants and other counterparties hedging, including by Defendants potentially purchasing the Issuer stock referenced in the TRS positions taken by Archegos. *Id.* While Archegos may not have fully known the precise extent and nature of each of Defendants' particular hedging strategies, the Archegos market manipulation scheme depended on some trading of Issuer shares referenced in the TRS to increase the market price of the Issuers' stock, including to some extent through Defendants' and other counterparties' purchasing proprietary hedged shares of the Issuers' stock. *Id.*

As Archegos's market manipulation scheme neared the precipice, Archegos specifically contacted Defendants during the week of March 22, 2021, to provide them with that MNPI, and to request that Defendants delay a default, coordinate a managed winddown, and otherwise coordinate the trading it anticipated might occur by Defendants, so as to maintain the best prices possible for the Issuers' stock. As such, in connection with Archegos's disclosure to Defendants of an array of MNPI, Archegos expected, or should have expected, that Defendants were positioned to likely trade the Issuers' stock. *Id*.

## III. TO MITIGATE THE FALLOUT FROM ARCHEGOS'S COLLAPSE, DEFENDANTS TRADED ON AND EXPLOITED THE MNPI THEY RECEIVED FROM ARCHEGOS

### A. As Archegos's Prime Brokers, Defendants Had a Duty of Confidentiality to Archegos

When Defendants provided prime brokerage and related margin lending, swap, and block trading services, they received Archegos's sensitive MNPI. Their prime brokerage relationship with Archegos necessitated treating that MNPI with trust and confidence. A356-57, A386. That duty arose from "the parties' history, pattern, practice, course of dealing, or relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transactions," as well as Defendants' "own corporate policies and practices." A364.

During the calls held with Archegos on March 25 and March 27, 2021, it was made clear that information regarding Archegos's positions in the Issuers, and its

16

inability to meet its margin calls from its brokers and other counterparties, was to remain confidential.  A344-45, A358, A364, A366.  In fact, during the calls held in March, the brokers explicitly contemplated circulating an NDA amongst the parties prior to discussing the full extent of their positions in the Issuers to the brokers on the call.  A344.  Defendants breached duties of confidence to Archegos by trading on MNPI revealed ahead of and during these calls.  A257, A464.

> **B.    During the Week of March 22, 2021 Defendants Unloaded Their Proprietary Shares Without Archegos's Knowledge and Tipped Clients to Do the Same**

Defendants sought to protect their profits from the fees they earned as a TRS counterparty by hedging the asset referenced in the TRS.  A302.  While hedging strategy can vary, here, Defendants hedged by purchasing, on their own, the asset referenced in the TRS as their proprietary hedged shares, distinct from Archegos's shares that it posted as collateral as part of the TRS contract.  *Id*.

While Archegos's prime brokers were determining whether to move forward with a controlled sale of Archegos's holdings, Defendants acted quickly to mitigate their own losses by engaging in front-running during the week of March 22, 2021.  A352-56.  Defendants knew that Archegos's collapse would cause catastrophic drops in the price of the Issuers' stocks, because Archegos's positions were extraordinarily large – ranging from 30% to 70% of the Issuers' outstanding float.

17

A314-15. Defendants then rapidly unloaded between 80% to 90% of their proprietary shares of the Issuers' stock. A349-51.

In other words, Defendants traded on MNPI by selling their proprietary shares, because they knew the value of those shares was set to significantly drop due to Archegos's impending liquidation. Defendants breached their duty of confidentiality to Archegos by selling their proprietary shares **before** Archegos liquidated its own large Issuer holdings. Only Archegos's prime brokers would have been aware of Archegos's plan to liquidate its holdings. As the *Wall Street Journal* later reported, Defendants "Morgan Stanley and Goldman Sachs balked at even the idea of [a controlled sale], saying that **within a day or two the market would get wind of the amount of stock that needed to be sold and pummel them**." A353 (emphasis in original). Defendants then unleashed a nearly unprecedented wave of block sales on March 25 and 26, 2021, together selling about $20 billion of the Issuers' stock through bulk trades causing the price of that stock to tank prior to Archegos's collapse becoming public. A451.

It is apparent that Defendants traded on Archegos's MNPI because the price of several of the Issuers' stock declined sharply just prior to Archegos's collapse becoming public. For example, on March 24 and 25, 2021, Defendants conducted large block trades of Issuers' stock with all the indicators of front-running and what is known on Wall Street as the "Morgan Stanley Fade." A352-53, A360-61. On

18

March 24, 2021, just before a block trade of Discovery was priced, its shares dropped almost 14%. A360. When Pawan Passi ("Passi"), the former head of Defendant Morgan Stanley's equity syndicate desk, made another block trade of Discovery shares the next day, the price dropped 7.2%. A361. While Archegos was aware of the block trade of Discovery shares, critically, Defendant Morgan Stanley did not disclose that it was front-running that block trade with ***sales of its own proprietary non-collateral shares or tipping preferred clients.***

As a result of these front-running sales, Defendant Goldman Sachs suffered no material losses from Archegos's collapse – as Goldman Sachs' CEO stated, it "got this one right." A355. Defendant Morgan Stanley also avoided any material losses. A354-55. Unlike Defendants, Archegos's other prime brokers (who did not engage in illicit front-running) suffered enormous losses, as did unwitting public investors. A355. But before the truth of Archegos's nonpublic controlling positions in the Issuers, market manipulation scheme, and impending collapse reached the public, Defendants exploited all of the MNPI, in breach of duties owed both to the Issuers and to Archegos, and, far beyond Archegos's expectations, unloaded billions of dollars of their own proprietary holdings in a single day. A443.

### C. Defendants Exploited Archegos's MNPI by Tipping Off Clients Ahead of Archegos's Collapse Becoming Public

Defendants further exploited the MNPI regarding Archegos's collapse by tipping off its clients before the impending implosion became public. This is

demonstrated by the fact that trading volumes for **each of the Issuer's shares** spiked on March 24, 2021, far exceeding their median trading volumes. A451. This spike in trading is a tell-tale sign of front-running, and in particular, of the Morgan Stanley Fade, *id.*, a fact which was not disclosed to Archegos, A452. Passi oversaw these trades which caused the trading volumes to spike for the Issuers' shares. *Id.*

On January 12, 2024, the SEC charged Defendant Morgan Stanley and Passi with a multi-year fraud involving the disclosure of confidential information about the sale of large quantities of stock known as "block trades." The SEC also charged Defendant Morgan Stanley with failing to enforce its policies concerning the misuse of MNPI related to block trades. Press Release, Sec. & Exch. Comm'n, SEC Charges Morgan Stanley and Former Executive Pawan Passi with Fraud in Block Trading Business (Jan. 12, 2024), https://www.sec.gov/newsroom/press-releases/2024-6.

## IV.   DEFENDANTS MITIGATED THEIR LOSSES AT THE EXPENSE OF ORDINARY INVESTORS AND THE CLASS

The fallout from Archegos's collapse caused severe harm to ordinary investors. A293. When the investing public finally learned that Archegos surreptitiously controlled enormous positions across in the Issuers' stock, those positions were a product of rampant market manipulation (enabled by Defendants), and that the Archegos house of cards was imploding, the artificially inflated market prices for the Issuers' stock collapsed, causing over $100 billion in market losses to

Lead Plaintiffs and other ordinary public shareholders who traded contemporaneously with Defendants Morgan Stanley and Goldman Sachs. *Id.*

## V. TESTIMONY AT HWANG'S CRIMINAL TRIAL HIGHLIGHTED DEFENDANTS' RECEIPT OF MNPI AND FRONT-RUNNING

Hwang and Archegos's then CFO, Patrick Halligan, were found guilty of criminal securities fraud in connection with on July 10, 2024.[2]  During the trial, witnesses testified, among other things, to that fact that Archegos zealously guarded the confidentiality of its positions across multiple brokers, including Defendants (Tr. 2644:8-22; 4077:23-4078:16); Will Tomita, the then "head trader" of Archegos complained to Halligan on March 24, 2021 that brokers, *i.e.*, Defendants, already were front-running Archegos's attempts to meet margin calls well before Archegos received any default notices; and a representative of Defendant Goldman observed on March 25, 2021, before any default notices were issued, that Archegos was not trading (*i.e.*, that other entities were trading in Archegos's place) (Tr. 252:24-253:14, 551:11-15).

---

[2]     This Court can take judicial notice of the existence of sworn testimony in the Hwang trial because the testimony occurred after the First and Second Dismissal Orders (respectively A1-21, A23-41) and is a judicial record in a related action. *See, e.g.*, *Young v. Selsky*, 41 F.3d 47, 50 (2d Cir. 1994) (taking judicial notice of "testimony in other cases"); *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("appeals courts may take judicial notice of filings or developments in related proceedings which take place after the judgment appealed from"); *Jacques v. U.S. R.R. Ret. Bd.,* 736 F.2d 34, 40 (2d Cir.1984) (taking judicial notice of official court record in related case of inferior court in same jurisdiction).

21

## PROCEDURAL HISTORY

These seven coordinated actions (the "Actions") alleged violations of Sections 10(b), 20(A), and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder, against Defendants Goldman Sachs and Morgan Stanley in connection with their illicit front-running trades in each respective Issuer's securities and client tips based on MNPI ahead of the March 2021 collapse of Archegos. A1-15.[3] The Actions were assigned to the Honorable Paul A. Crotty.

Pursuant to the lead plaintiff appointment process prescribed by the PSLRA, and after directing the parties to brief the issues of consolidation, coordination, and leadership, the district court: (i) ruled on March 10, 2022, that the Actions should be "closely coordinated, but not consolidated" (A33-39); and (ii) on April 12, 2022, appointed Lead Plaintiffs and Lead Counsel and approved a proposed leadership structure consisting of a Plaintiffs' Executive Committee and Coordinating Counsel to aid in the coordination of the Actions. A40-49.

On June 13, 2022, Plaintiffs filed their First Amended Complaints ("FAC") in each of their respective Actions. A50-192.

---

[3]     All district court docket references herein correspond to the action captioned *Tan v. Goldman Sachs Grp., Inc.*, 1:21-cv-08413-JSR (S.D.N.Y.) ("*Tan*"), the first of the seven coordinated putative securities class actions. By Order dated June 5, 2024, the appeals in each of the seven Issuer cases have been consolidated, and the *Tan* appeal has been designated the Lead Appeal. App. Dkt. 24-1162, ECF 16.

On August 12, 2022, Defendants moved to dismiss the FAC. A193-229. In their motion to dismiss, Defendants did not dispute: (i) that they received MNPI from Archegos; and (ii) that while in possession of that MNPI, Defendants liquidated a significant portion of their proprietary holdings in the Issuers, thus avoiding for themselves billions of dollars in losses. A197-229. Instead, Defendants argued that they purportedly had a contractual right to sell their shares in response to being informed of Archegos's default. A204-05, A213-19. Defendants further argued that Plaintiffs could not sustain an insider trading claim under the "tipper/tippee" theory of liability. A219-21. Under this theory, Plaintiffs alleged that Defendants were insiders vis-à-vis the Issuers, and when they received tipped information from Archegos – and were thus "tippees" – Defendants breached their duties of confidence to the Issuers and, derivatively, to the Issuers' shareholders by trading on that information. A164-66.

In an opinion dated March 31, 2023, the district court granted Defendants' motions to dismiss the FAC. SPA1-21 ("First Dismissal Order"). With respect to Plaintiffs' tipper/tippee theory of liability, the district court found that Plaintiffs adequately plead that Defendants possessed MNPI and insider status with respect to Archegos, but that it failed to allege personal benefit to Archegos. SPA16-18. As for the misappropriation theory, the district court found that, while there was no dispute that: (i) Defendants were in possession of MNPI; and (ii) Defendants traded

on such MNPI, Plaintiffs had failed to sufficiently allege that Defendants traded on the MNPI in breach of a duty owed to Archegos. SPA10-15.

On May 16, 2023, Plaintiffs filed their Second Amended Complaints ("SAC"), which specifically addressed the deficiencies identified in Judge Crotty's opinion. A284-396. The SAC pled personal benefit to Archegos in "tipping" Defendants with the MNPI. A345-48. The SAC further pled facts that show that Defendants traded on the MNPI in breach of a duty that they owed to Archegos, including extensive detail regarding Defendants' front-running of the market through their block trades of the Issuers' stock. A349-59.

On July 18, 2023, Defendants moved to dismiss the SAC. A397-434 (the "Second MTD"). The Second MTD essentially ignored the allegations of the SAC whereby Plaintiffs directly addressed and cured the few defects found by Judge Crotty, and instead raised a litany of ancillary issues, made misstatements of law, and included little-to-no analysis of the new facts pled in the SAC, which directly addressed the bases for Judge Crotty's First Dismissal Order. A401-34.

On September 15, 2023, Plaintiffs filed their briefs in opposition to the Second MTD. A435-71. First, regarding Plaintiffs' tippee claim, Plaintiffs' opposition argued that Judge Crotty correctly found that Archegos was an insider with MNPI and explained in detail how the SAC cured what the Court had identified as the defect in that claim – namely, a failure to adequately allege that Archegos shared

MNPI to seek a personal benefit.  A445-51, A454-59.  Plaintiffs thus set forth that the SAC adequately alleged tippee liability, and further explained the flaws in Defendants' legal arguments.

Second, Plaintiffs' opposition explained in detail how the SAC adequately addressed the only gap Judge Crotty had found regarding Plaintiffs' misappropriation theory – that is, that Plaintiffs had "not point[ed] to a single trade executed by Defendants where they did not disclose the trade to Archegos."  A451-52.  Plaintiffs' opposition sets forth the new facts pled in the SAC regarding Defendants' front-running scheme.  In their opposition, Plaintiffs noted that it was undisputed that Defendants possessed MNPI and explained: (i) that Defendants clearly had a duty to maintain the confidentiality of the MNPI; and (ii) how Defendants breached that duty through the trades Defendants did not disclose to Archegos.  A453-63.  Thus, the opposition established that Plaintiffs had adequately pled a misappropriation theory of insider trading liability.

On February 29, 2024, after the Second MTD was fully briefed and pending before Judge Crotty for over four months, the cases were reassigned to the Honorable Jed S. Rakoff.

Less than one month later, on March 28, 2024, Judge Rakoff issued an Order dismissing the cases with prejudice.  In so doing, Judge Rakoff ignored and contradicted Judge Crotty's prior rulings, and improperly dismissed the claims on

grounds that the parties had not briefed. The dismissal orders are the subject of this appeal. SPA1-41.

On April 25, 2024, Plaintiffs timely filed a Notice of Appeal of the Order, which appeal is now before this Court. A490-506.

## SUMMARY OF ARGUMENT

Defendants enabled a massive, surreptitious market-manipulation house of cards, and then front-ran its collapse. Although acknowledging this "surreptitious plot to pump and dump the Issuers' stock" was "no doubt a devious scheme" (SPA36), the district court dismissed the Actions on the basis of several simple errors of law and fact.

The district court dismissed Plaintiffs' tipper/tippee theory on two threshold redefinitions that plainly contravene settled law. The district court first redefined MNPI as limited to internal corporate information that "belonged to" the Issuers. SPA34. Then, the district court redefined "insider" as limited to those with actual access to that narrow category of information meeting the district court's already mistaken redefinition of MNPI. SPA34-35. Contrary to this erroneous (and circular) reasoning, it is well-settled that MNPI is not limited to internal corporate information, but rather also extends to material nonpublic market information that emanates from outside the corporation and concerns the trading market for the Issuers' stock – *i.e.*, exactly what Plaintiffs allege here. With the district court's

constrictive redefinitions corrected, Plaintiffs' tipper/tipper theory suffices to state a claim.

The district court dismissed Plaintiffs' misappropriation theory by misconstruing the facts alleged, applying impossibly high pleading standards, and improperly drawing inferences against Plaintiffs. Measured against proper standards, with the actual facts alleged accepted as true and all inferences drawn in Plaintiffs favor, Plaintiffs' misappropriation theory suffices to state a claim.

The district court's dismissal should be reversed in full.

## ARGUMENT

"'Section 10(b) prohibits the use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.'" *SEC v. Dorozhko*, 574 F.3d 42, 49-50 (2d Cir. 2009) (alteration in original) (quoting 15 U.S.C. §78j(b)). In turn, the rules and definitions validly promulgated thereunder by the SEC expressly prohibit what is often colloquially referred to as "insider trading," *i.e.*, "the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information." 17 C.F.R. §240.10b5-1(a).

Under these and related provisions, insider trading claims manifest in two primary theories. *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012). One is grounded in "the duty of trust and confidence insiders ***owe to shareholders,***" and another is "grounded in misappropriation, [which] targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence" and who breach a duty owed "***to the source of the information***," whoever that source may be. *Id*. Both theories also "reach situations where the insider or misappropriator tips another who trades on the information," such that the tippee takes on the duty derivatively. *Id*. at 285. Whatever the theory, once "in receipt of material non-public information," the party takes on "***a duty to abstain from trading or to disclose the information publicly***." *Id*. at 284. Plaintiffs allege both a "tipper/tippee" theory and a "misappropriation" theory.

Under the "tipper/tippee" theory, Plaintiffs alleged that Defendants traded while in possession of MNPI tipped to them by Archegos in breach of duties it owed to the Issuers, as an insider and misappropriator with undisclosed massive controlling beneficial ownership in and control over the Issuers' and their stock. The relationship between Archegos and Defendants bears the hallmarks of a *quid pro quo*, for Archegos's market manipulation scheme was entirely dependent on continued prime brokerage services and capacity from Defendants (and other prime brokers), who in return received exorbitant fees from Archegos. Archegos

personally benefitted from providing Defendants the MNPI needed to secure their services, including direct financial benefits, *e.g.*, massive investment gains and losses avoided via the market manipulation scheme itself, but Archegos also leveraged the reputational and other non-pecuniary benefits of its relationships with Defendants to access additional prime brokerage capacity despite its marred history of illegal trading and convictions. When the Archegos house of cards became increasingly tenuous, Archegos provided MNPI to Defendants to seek their cooperation in coordinated sales of Issuer stock, which would benefit Archegos by delaying or moderating its impending default.

Plaintiffs also alleged a misappropriation theory, under which Defendants are liable for front-running Archegos's block trades of its collateral with sales of their own proprietary shares (and tips to hedge fund clients to do the same) – for example, on March 24 and 25, 2021 – in breach of duties of confidence they owed directly to Archegos. While Archegos enlisted Defendants to execute certain confidential block trades of shares Archegos owned and posted as collateral for its margin accounts with Defendants, that limited coordination was no license for Defendants to front-run those block trades of Archegos-owned collateral by surreptitiously selling off distinct proprietary shares owned by Defendants (not Archegos) and thus not held as collateral or otherwise subject to any such margin or swap contracts with Archegos. Rather, these distinct hedged shares were independently bought and

29

owned by Defendants or their other hedge fund clients for their own proprietary accounts. Defendants are currently under government investigation for this conduct, and as a result, Defendants' employees, including the long-time head of Morgan Stanley's block trading, Passi, have been fired as a result and charged by the SEC for fraud for this very conduct.

Across the board, the district court's dismissal rests on basic errors of law and fact. But, as explained below, with those errors corrected and all inferences properly drawn in Plaintiffs' favor, the alleged facts more than suffice at this stage.

## I. THE DISTRICT COURT ERRED IN HOLDING THAT THE DEFENDANTS ARE NOT LIABLE FOR INSIDER TRADING UNDER THE "TIPPER/TIPPEE" THEORY

Under this theory, a tippee receiving MNPI is liable if: (1) he "had reason to know that the tipper disclosed [MNPI] in breach of a duty and received a personal benefit in the process"; and (2) "the tippee used that [MNPI] by trading or tipping for his own benefit in disregard of that knowledge." *United States v. Blaszczak*, 56 F.4th 230, 248 (2d Cir. 2022). "Absent a personal benefit, liability may still attach if the tippee knew the tipper gifted the MNPI with an expectation that he would trade on it." SPA10 (citing *Salman v. United States*, 580 U.S. 39, 42 (2016)).

In the First Dismissal Order, the district court (Judge Crotty) correctly accepted that Plaintiffs had adequately alleged nearly all these elements – including that Archegos qualified as a controlling shareholder and thus constructive insider of

the Issuers, and that the information Archegos tipped to the Defendants qualified as MNPI – but ultimately dismissed with leave to cure a few discreet gaps regarding the element of "personal benefit" to Archegos. SPA16-18. With the SAC, Plaintiffs added allegations to cure those specific deficiencies, A345-48, and the parties fully briefed the Second MTD focused on whether the SAC in fact cured those identified deficiencies, A445-51, A457-59.

But then, after briefing closed on the Second MTD, the case was transferred to a different district judge who, without hearing any argument, issued an abrupt Second Dismissal Order that contradicted the First Dismissal Order in critical respects, instead holding: (1) that the allegedly tipped information did not qualify as MNPI because it was not internal corporate information that "belonged to" the Issuers themselves; and (2) that Archegos, even though a controlling shareholder exercising actual control over the Issuers through its massive undisclosed beneficial ownership and market manipulation scheme, did not qualify as an insider because it lacked access to information meeting the district court's narrow redefinition of MNPI. SPA34-37.

Both redefinitions are erroneous. MNPI is not limited to internal corporate information that belonged to the Issuers. Rather, it is well-established that MNPI also encompasses material nonpublic market information like that alleged here. With that threshold mis-definition of MNPI corrected, the remainder of the district

31

court's reasoning falls apart. A controlling shareholder's insider status does not depend on some additional showing of actual access to MNPI, but even if it did, Plaintiffs have in fact alleged exactly that, for Archegos certainly had access to the material nonpublic market information at issue in this case. As such, by tipping that MNPI to Defendants, Archegos breached its duties owed to the Issuers as a controlling shareholder insider (and misappropriator).

### A. The District Court's Constrictive Redefinition of MNPI Is Contrary to Law

Nearly every holding in the district court's Second Dismissal Order emanates from its threshold error in redefining MNPI as limited to internal corporate information that belongs to, is sourced from, and is maintained for the exclusive use of the Issuers. *See, e.g.*, SPA30 (holding Plaintiffs "failed to allege the defendants traded on confidential information" because the alleged MNPI was not corporate information maintained internally for the Issuers' "exclusive use"). That overly constrictive redefinition of the term MNPI is a misstatement of law, contrary to well-established precedent and practice across innumerable insider trading scenarios.

Insider trading liability, as codified under Section 10(b) and its implementing regulations, turns more broadly on any "material nonpublic information ***about th[e] security or issuer***." §240.10b5-1(a). Nothing in that language (or the decades of case law interpreting it) says anything about limiting its expansive scope to internal corporate information, much less internal corporate information that "belongs" to, is

32

sourced from, or is within the "exclusive use" of the corporation. Rather, the plain language (and well-established precedent) requires simply that the information be both "non-public" and "material" to either the "security or issuer." §240.10b5-1(a). That remains so even if the MNPI is not sourced from inside the corporation or maintained for the "exclusive use" of the issuer.

This understanding of MNPI has been well-established law for decades. For example, the Second Circuit recognized it explicitly in *United States v. Chiarella*, 588 F.2d 1358 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980). There, the defendant had no access to internal corporate information within the exclusive control of the issuer. Rather, he was an outsider working at a specialty print shop that would typeset lawyer and banker press releases publicly announcing tender offers by outside companies targeting the issuers. *Id.* at 1362. He exploited this position to buy shares in targeted/to-be-acquired issuers just prior to publication of the acquiring company's tender offer; then after "each tender offer was publicly announced, the market price of [the] recently purchased shares increased sharply," and the outsider defendant then "quickly sold out and turned a handsome profit." *Id.* at 1363. That the defendant did not have access to internal corporate information sourced from the companies "whose securities he traded [was] true, but irrelevant," for "even the most unscrupulous officer or director could scarcely have a greater opportunity to reap sure profits than market insider Chiarella had by virtue of the

33

*market information* at his disposal." *Id*. at 1365. As the Second Circuit explained, for purposes of insider trading liability, "material nonpublic information" is not limited to corporate information sourced from within the subject issuer, but rather also includes nonpublic "market information" that emanates from outside the corporation but is nevertheless material in the sense that it "affects the price of a company's securities without affecting the firm's earning power or assets." *Id*. at 1365 n.8. Indeed, the Second Circuit recognized several classic examples of such external market information, including "information that an investment advisor will shortly issue a 'buy' recommendation or *that a large shareholder is seeking to unload his shares* or that a tender offer will soon be made for the company's stock." *Id*. (citing *In re Matter of Oppenheimer & Co*., SEC Release No. 508, 1976 WL 160384 (SEC Apr. 2,1976)); *see also Crane Co. v. Westinghouse Air Brake Co*., 419 F.2d 787, 795 (2d Cir. 1969) (where outside, surreptitious controlling shareholder "has 'substantial, direct pecuniary interest in the success of [a security] takes active steps to effect a rise in the market' in the security" and takes "affirmative steps to conceal form the public its own secret sales . . . at the same time it was domination trading in [the securities]," that "market information" related to "superheated" "secret sales" constitutes MNPI and the major shareholder's "failure to disclose the trading scheme" constitutes violation of §10(b)).

The Supreme Court has endorsed the same. Just a few years after *Chiarella*, the Supreme Court explicitly rejected an attempt (similar to the district court's faulty redefinition) to delimit MNPI as only internal corporate MNPI, not external market MNPI:

> [T]he SEC attempts to distinguish [*Chiarella*] factually as involving not "inside" information but rather "market" information . . . . This Court drew no such distinction in *Chiarella* and, as the Chief Justice noted "[i]t is clear that sec 10(b) and Rule 10b-5 by their terms and by their history make no such distinction."

*Dirks v. SEC*, 463 U.S. 646, 657 n.15 (1983) (quoting *Chiarella,* 445 U.S. at 241 n.1); *see also United States v. O'Hagan*, 521 U.S. 642, 658 (1997) (endorsing same); *United States v. Carpenter*, 791 F.2d 1024, 1029 (2d Cir. 1986) (rejecting "distinctions premised on the source of the information" because they would "undermine the prophylactic intent of the securities laws"), *aff'd*, 484 U.S. 19 (1987).

So too, the SEC has long and unmistakably prescribed this same, broader understanding of what types of information can qualify as MNPI. *See, e.g*., *Oppenheimer*, SEC Release No. 508, 1976 WL 160384 ("There is today no question that the misuse of undisclosed, material 'market information' can be the basis of" insider trading violations under Section 10b, explaining that such "market information" qualifying as MNPI includes "information which emanates from non-corporate sources and deals primarily with information concerning or affecting the

trading markets for a corporation's securities."). Indeed, were the district court's contrary redefinition correct and MNPI truly limited to internal corporate information sourced from the corporation itself, that constrictive redefinition would neuter the SEC's routine prosecutions across innumerable contexts – *e.g.*, regarding impending tender offers, market print shops, pump-and-dump schemes, financial periodicals, front-running of analyst recommendations, and so on – all of which turn on material nonpublic market information that "emanates from non-corporate sources and deals primarily with information concerning or affecting the trading for a corporations securities." *Id*.; *see also SEC v. Sorg Printing Co., Inc*., No. 74 CIV. 3634, 1975 WL 368 (S.D.N.Y. Mar. 28, 1975) (three financial printer employees); *SEC v. Ayoub*, SEC Litig. Rel. No. 7416 (S.D.N.Y. May 27, 1976), 9 SEC Docket 756 (1976), summarized Fed. Sec. L. Rep. (CCH) P95,567 (tippee of financial printer for offeror); *SEC v. Ayoub*, SEC Litig. Rel. No. 7493 (S.D.N.Y. July 21, 1976), 10 SEC Docket 86 (1976) (financial printer and another tippee); *SEC v. Primar Typographers, Inc*, SEC Litig. Rel. No. 7580 (S.D.N.Y. Sept 27, 1976), 10 SEC Docket 626 (1976) (typesetter of newspaper ads announcing tender offers), Fed. Sec. L. Rep. (CCH) P95,734.

So too, legal commentators of all stripes have time and time again underscored this settled, full scope, MNPI, for reasons plain and manifold:

> Neither the history nor the policy of the antifraud provisions (and certainly not their language) confines their coverage to . . . information

> which comes from within the corporation . . . . Other kinds of information, such as market information [i.e., nonpublic information concerning trading of the corporation's securities], may also be material to investment decisions . . . . Market information need not come from, or indeed be known at all to, sources "inside" the enterprise . . . .

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L. Rev. 322, 330 (1979) (seminal article endorsed by the Supreme Court and the Second Circuit); *O'Hagan,* 521 U.S. at 658 (favorably citing this seminal article); Bromberg & Lowenfels on Securities Fraud, Rule 10b-5 in Operation, §6:213 (explaining that MNPI also includes "information [] generated outside the company whose securities are in question but affects the company or its securities," and that given prescriptions in *Chiarella* and *Dirks* "10b-5 applies . . . equally to inside information and to market information . . . *e.g.*, that a tender offer is about to be made for [a] company"); Arthur Fleischer *et al.*, *An Initial Inquiry Into the Responsibility to Disclose Market Information*, 121 U. Pa. L. Rev. 798, 800 (1973) (collecting wide variety of material nonpublic "market information" that qualifies as MNPI because it concerns "information about events or circumstances which affect the market for a company's securities," including where "[c]ertain persons may know that they or others intend to purchase or sell a sufficiently large number of shares of ABC Company to affect substantially the present market price of the stock") (citing, *e.g.*, *Reed v. Riddle Airlines*, 266 F.2d 314, 315, 319 (5th Cir. 1959) (defendant failed to disclose that a wealthy individual was interested in

purchasing shares, where those purchases caused an increase in price of the stock); *Rogen v. Ilikon Corp.*, 361 F.2d 260, 264 (1st Cir. 1966); *Matarese v. Aero-Chatillon Corp.*, No. 68 CIV. 4451, 1971 WL 312 (S.D.N.Y. Dec. 22, 1971)).

Congress, too, when revisiting the insider trading provisions of the Exchange Act, has recognized that the concept of MNPI cannot be limited to internally sourced corporate MNPI, but rather also encompasses externally sourced market MNPI:

> Moreover, for the purposes of the anti-fraud provisions, it does not matter whether the information about a corporation or its securities originates from inside or outside of the corporation. Thus, if a purchaser of a target company's securities in a tender offer has information received from the investment banker of the bidder, this "market" information may be considered inside information for purposes of the anti-fraud provisions . . . .

H.R. REP No. 98-355, at 4 (1983) (citing *Dirks*).

Despite all the foregoing, the district court failed to even consider this broader scope of MNPI, much less any of the controlling authority endorsing that broader scope. Instead, the district court started by citing an earlier case that did not concern the definition of MNPI, then mistook that passing shorthand as an exhaustive restatement of what information qualifies as MNPI. SPA33 (quoting *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 295-96 (2018)). Starting from that earlier criminal case, in which Judge Rakoff in passing summarized insider trading claims as "[e]ssentially" being a "species of . . . embezzlement" where the taken "property is a company's material confidential information," the district court then placed

together a few out-of-context quotes stating merely that a company's "confidential information" can qualify as "property to which the company has a right of exclusive use," but then jumped to the erroneous conclusion that MNPI is categorically limited to internal corporate information that "belongs to the firm itself." SPA34.

That is a "game of telephone," not precedent.[4] Nothing in *Pinto-Thomaz* or any of the other cases cribbed by the district court actually purports to define the exact contours of MNPI. Nor does any of it even arguably purport to overrule or erase the long-established Supreme Court, Second Circuit, and the chorus of other authority, explaining that MNPI is not limited to inside corporate information, but also extends to externally sourced market information concerning massive, impending sell-offs of the subject securities. Nor can snippets of dicta from criminal wire fraud cases that analogize MNPI to property somehow redefine MNPI as limited to information that would qualify as property "for a company's 'exclusive right and benefit.'" SPA30 (quoting *Carpenter*, 484 U.S. at 26).

For example, the district court misquoted *United States v. Martoma* to support the erroneous proposition that MNPI is limited to "confidential information that

---

[4]     *Threat v. City of Cleveland*, 6 F.4th 672, 679 (6th Cir. 2021) ("shorthand characterizations of laws should not stray. Else, like 'the children's game of telephone,'" we risk "converting the ultimate message into something quite different from the original message—indeed sometimes into the opposite message." (quoting *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 336 (6th Cir. 2014) (rejecting reductive shorthand that "requires [court] to add words" or atextual limitations to well-stablished legal elements))).

'belongs to the firm itself.'" SPA 30 (quoting 894 F.3d 64, 73 (2d Cir. 2017)). But *Martoma* does not support that proposition, does not purport to address the contours of what information qualifies as MNPI, and the snippet misquoted by the district court rather merely explains the distinct concept of "personal benefit" in a context where the subject MNPI happened to be "a firm's confidential information." *See Martoma*, 894 F.3d at 72-75. That one category of MNPI – a firm's confidential information – in a particular context necessarily belongs to the firm itself, is no basis to presume that all MNPI in every context is limited to that single category. Other categories of MNPI exist, including external market information like that alleged here, which emanates from non-corporate sources and thus obviously does not "belong to the firm itself." *See supra* at 33-38. As such, even if the alleged MNPI belonged to Archegos in some sense, it still qualifies as MNPI – it was plainly material and nonpublic because, *inter alia*, it had been treated that way, was described as such, and had not been disclosed to the public at large. *See, e.g., SEC v. Panuwat*, No. 21-CV-06322-WHO, 2023 WL 9375861, at *5 (N.D. Cal. Nov. 20, 2023) ("information may be material to more than one company and that information does not need to come from the issuer of the security to be material." (citing *Carpenter*, 791 F.2d at 1032 n.9 (explaining that MNPI is material if it "might affect the value of the corporation stock or securities"))). Yet Archegos disclosed that MNPI to Defendants for a personal benefit in violation of duties Archegos owed as

a controlling shareholder of the Issuers. Defendants exploited MNPI to which Archegos had a personal property right of exclusive use. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 427 (S.D.N.Y. 2015) ("Morgan Stanley caused it personal harm by exploiting Veleron's own confidential information (its liquidity issue), to which Veleron had a personal property right of exclusive use.").

At bottom, the district court's rationale rests on an affirming-the-consequent fallacy. Just because all bears are mammals, it does not follow that all mammals are bears. Same here: just by citing a few cases where the MNPI at issue was internal corporate information that was the exclusive property of the corporation, it does not follow that in all cases MNPI should be categorically limited to such internal corporate information. *See supra* at 33-38 (MNPI also reaches non-corporate market information); *see also Hamilton v. Dallas Cnty.*, 79 F.4th 494, 505 n.64 (5th Cir. 2023) (bemoaning that although individual opinions may "vary in how they articulate" a particular legal standard, such variation reflects dicta and "should not be passed from opinion to opinion, lest the message [of the actual legal standard] be mangled as if in 'the children's game of telephone'").

With the district court's faulty redefinition corrected, it remains that material nonpublic information need only be that – material and nonpublic – and it certainly is not limited to information that "belongs to the firm itself." *Cf.* SPA34. Again, the question is not the "corporate" source or exclusivity of the subject information, but

41

rather simply whether that information is both "nonpublic" and "material" to the "security or the issuer." *See, e.g., SEC v. Panuwat*, No. 21-CV-06322, 2022 WL 633306, at *4 (N.D. Cal. Jan. 14, 2022) ("Section 10(b) and Rule 10b-5 cast a wide net, prohibiting insider trading of '*any* security' using '*any* manipulative or deceptive device.' . . . Importantly, Rule 10b5-1(a) does not state that the information 'about that security or issuer' must come from the security or issuer itself in order to be material. ***It only requires that the information be material and nonpublic***." (quoting §78j(b); §§240.10b-5 & 240.10b5-1(a))).

Here, the alleged information was both material and nonpublic at all relevant times. Certainly, there can be no dispute over the materiality of the impending collapse of a massive market manipulation scheme surreptitiously accounting for upwards of 70% of the Issuers' float. Nor is there any dispute that the alleged MNPI remained nonpublic before Defendants' massive front-running trades and tips. *See SEC v. Mayhew*, 121 F.3d 44, 50 (2d. Cir. 1997) (information remains "nonpublic" until either: (1) the information is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" or (2) "although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock'").

### B.     The District Court Erroneously Conditioned Insider Status on Actual Access to Its Own Threshold Mis-Definition of MNPI

Compounding its mis-definition of MNPI, the district court then misapplied it to truncate which controlling shareholders qualify as insiders.  In the First Dismissal Order, Judge Crotty correctly held that Plaintiffs plausibly alleged that Archegos qualified as a controlling shareholder of each of the Issuers, and thus a constructive insider of each, because Archegos, through its surreptitious market manipulation scheme facilitated by Defendants, indisputably "had massive control over the price of [Issuers'] stocks" which were "specifically altered solely through the actions of Archegos," thus "plac[ing] Archegos in possession of MNPI regarding the Issuers' stocks."  SPA17.  But then in the Second Dismissal Order, the newly presiding judge inexplicably reversed on this issue, holding instead that "insider status as a controlling shareholder" requires additionally showings: "either that a controlling shareholder ha[d] access to confidential corporate information or control over corporate affairs."  SPA35.  Then, having already erroneously redefined MNPI as limited to internal corporate information, the district court reasoned that because the alleged MNPI that Archegos surreptitiously obtained does not meet that newly coined, overly constrictive mis-definition (*i.e.*, was not internal "corporate information" and "did not 'belong' to the Issuers"), Archegos "lacked access to the Issuers' confidential information" and thus could not possibly qualify as a constructive insider.  SPA34, 36-37.

43

The district court's reasoning on this is circular and erroneous in several respects. **<u>First</u>**, the conclusion that Archegos "lacked access" to MNPI derives entirely from the district court's threshold mis-definition of what types of information qualify as MNPI. Contrary to the district court's pronouncement, MNPI is not limited to internal corporate information that "belongs" to the Issuer, but rather also encompasses material nonpublic "market information" that "emanates from non-corporate sources" and "concern[s] or affect[s] the trading for a corporations' securities." *Oppenheimer*, SEC Release No. 508, 1976 WL 160384 ("no question that the misuse of undisclosed, material 'market information' can be the basis of antifraud violations").

Plaintiffs allege exactly this type of MNPI: that "Archegos's undisclosed, massive beneficial ownership stakes across the Issuers . . . were built by a TRS trading scheme meant to manipulate the market and evade securities laws" and that, moreover, by March 2021, this surreptitious "pump-and-dump" scheme – accounting for up to 70% of the Issuers' outstanding float – "was about to implode and bring the Issuers' stock down with it." A443. Contrary to the district court's incorrect definition of MNPI, courts nationwide, including the Second Circuit, have consistently recognized information just like that alleged here – *i.e.*, "that a large shareholder is seeking to unload his shares" – as a quintessential example of the type of external, non-corporate market information that nevertheless qualifies as

actionable MNPI for purposes of insider trading liability under Section 10b. *See, e.g., Chiarella*, 588 F.2d at 1358. Because the district court's redefinition is itself contrary to law, it cannot delimit which controlling shareholders qualify as insiders.

**Second**, regardless of the precise contours of the term MNPI, the insider status of controlling shareholders does not depend on whether any specific shareholder had actual access to such MNPI. Rather, controlling shareholders "are easily characterized as insiders," SPA16, for it is "the power over corporate affairs associated with significant equity ownership" that "implicates access to inside information and the potential for insider trading," *Levy v. Southbrook Int'l, Invs., Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001) (insider status based on beneficial ownership interest). Just as an absentee officer or director still qualifies as an insider regardless of whether they in fact attend board meetings, access internal databases, review board presentations, etc., the "significant equity ownership" of controlling shareholders "implicates access" to MNPI regardless of whether the shareholder actually avails it. *Id*. Under the express provisions of the Exchange Act, Archegos's massive beneficial ownership renders it a "statutory insider" as a matter of law, on whose "significant ownership interest" is "'presumed to have access to inside information.'" *Donoghue v. Hearst Commc's, Inc*., 355 Fed. App'x 520, 521-22 (2d Cir. 2009) (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co*., 423 U.S. 232,

243 (1976)).[5]  As such, the district court's reasoning is in error.  A plausible inference that Archegos, an undisputedly controlling shareholder, qualified as an insider does not depend on Plaintiffs further establishing that Archegos also in fact "ha[d] the same sort of access to information as a result of their position of power as the typical officer and director."  SPA35.  Rather, Archegos had the power, control, and access necessarily associated with significant equity ownership, which in turn supports a plausible inference that Archegos did "have the same sort of access to information as a result of their position of power as the typical officer and director." *Id*.

**Third**, contrary to the district court's mischaracterization, neither Plaintiffs nor Judge Crotty reasoned that Archegos's "insider status as a controlling shareholder . . . arise[s] from stock ownership alone."  *Cf.* SPA35.  Rather, as Plaintiffs alleged and argued, and as Judge Crotty explained in the First Dismissal Order, in addition to massive, undisclosed beneficial ownership, "Archegos had massive control over the price of the stocks themselves because the prices were artificially inflated as a direct result of Archegos's market manipulation scheme,"

---

[5]    While Judge Crotty held that the 10% beneficial ownership threshold for statutory insiders under Section 16(b) is short of "controlling" and thus "does not, in and of itself, establish Archegos had a more general duty of confidentiality," SPA16-17 n.6, if mere noncontrolling 10% beneficial owners are statutorily "presumed to have access to insider information," then the same presumption surely applies to controlling shareholders like Archegos, who beneficially controlled upwards of 70% of the outstanding float.

including "several instances where the prices were specifically altered solely through the actions of Archegos," and that this "level of control placed Archegos in possession of MNPI regarding the Issuers' stocks." SPA17; *see also Gruber v. Gilbertson*, No. 16CV9727, 2021 WL 2482109, at *14 (S.D.N.Y. Mar. 20, 2018) (finding outside shareholders with undisclosed major beneficial interest qualified as insiders in part because they "engaged in a stock manipulation scheme to pump up [the issuer's] stock in order to trigger . . . a payout to themselves"). In light of Plaintiffs' allegations collectively (not stock ownership alone), "Archegos had far more practical control over the Issuers and their stock than most insiders do, such as a lone director or mid-level executive." A454.

**Fourth**, even were the insider status of controlling shareholders properly conditioned on a further showing of actual access to MNPI, with the district court's mis-definition of MNPI corrected, Plaintiffs have alleged exactly that: by means of its very own (albeit surreptitiously obtained) controlling beneficial ownership stakes across the Issuers, Archegos indisputably had actual access and possession of the material nonpublic market information alleged. *See supra* at 34 (explaining quintessential examples of material nonpublic market information include "a large shareholder is seeking to unload his shares . . ."); *see also Crane*, 419 F.2d at 793 (holding controlling shareholder's surreptitious "extraordinary buying[], coupled with its large secret sales" was MPNI because, *inter alia*, it "inevitably distorted the

47

market picture and deceived public investors . . . to create the appearance of an extraordinary demand for [the issuer's] stock and a dramatic rise in market price" and thereby "concealing from the public – and in particular from the [issuer's] stockholders – the true situation as to the market [the outside controlling shareholder] was making in [the issuer's] stock").

**Fifth,** even were it somehow not a statutory insider, Archegos was still duty-bound by §§13(d) and 16 to disclose this information to the Issuers, rather than secretly tip it to Defendants. The duties imposed by §§13(d) and 16 exist precisely to "ensure that investors will be informed about purchases of large blocks of shares," as those circumstances can be exceedingly important to investors. *See Hallwood Realty Partners, L.P. v. Gotham Partners*, L.P., 286 F.3d 613, 620 (2d Cir. 2002). Thus, failure to abstain or disclose in violation of these beneficial ownership thresholds is itself a "deceptive act" under §§10(b) and 20A: "it signal[s] falsely to investors that there was no such ownership to disclose." *Gruber*, 2018 WL 1418188, at *13; *see, e.g., Puddu v. 6D Glob. Techs., Inc.*, No. 15-CV-8061, 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021). Archegos breached these duties and thus misappropriated MNPI. *See Gruber*, 2018 WL 1418188, at *13; *SEC v. Wyly*, 788 F. Supp. 2d 92, 98 (S.D.N.Y. 2011) (evading §13(d) requirements "deprived the markets and investors of information . . . important to investment decisions" and thus defendant breached duty to issuers).

**Finally**, while the district court acknowledged that the alleged "surreptitious plot to pump and dump the Issuers' stock" was "no doubt a devious scheme," it then swept it aside under general notions that "not every instance of financial unfairness constitutes fraudulent activity under Section 10(b)."  SPA36.

To the contrary, the Exchange Act should be construed not restrictively, but flexibly to effectuate its remedial purposes.  Both the Supreme Court and the Second Circuit have specifically warned against such a dismissal where insider trading claims may present novel or unusual schemes:

> (We do not) think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the [claim]'. We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. ***Novel or atypical methods should not provide immunity from the securities laws***.

*Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) (citing *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)); *Dorozhko*, 574 F.3d at 49-50 ("Absent a controlling precedent that [a term] has a more limited meaning than its ordinary meaning, we see no reason to complicate the enforcement of Section 10(b) by divining new requirements. In reaching this conclusion, we are mindful of the Supreme Court's oft-repeated instruction that Section 10(b) 'should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'").

49

## II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE DEFENDANTS ARE NOT LIABLE FOR INSIDER TRADING UNDER THE "MISAPPROPRIATION" THEORY

The SAC alternatively alleged that Defendants are liable under the "misappropriation" theory of insider trading. *See* SPA37-40. Under this theory, a person who is ***not*** a corporate insider violates Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when he is entrusted with confidential information and "breach[es] a fiduciary duty to the source of the information to gain personal profit in the securities market." *Obus*, 693 F.3d at 284. That misappropriator is also liable when he "breache[s] a fiduciary duty by tipping material non-public information, ha[s] the requisite scienter . . . and personally benefit[s] from the tip," and the tippee "trades on the information." *See id.* at 285. Under either manner of "misappropriation," once "in receipt of material non-public information," there is "***a duty to abstain from trading or to disclose the information publicly***." *Id.* As set forth below, the district court erroneously held that Defendants are not liable under either theory.

### A.    Defendants Misappropriated and Traded Using Archegos's MNPI

To allege insider trading under the misappropriation theory, Plaintiffs must establish that: (1) Defendants possessed MNPI; (2) which they were duty-bound to keep confidential; and (3) breached that duty by acting on (*i.e.*, trading on) or

revealing the MNPI. *SEC v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011).

The SAC alleges that Defendants received MNPI on March 24 and 25, 2021. A342-43. This MNPI included statements from Archegos to Defendants on March 24, 2021 that the Company would not be able to meet the margin calls until the following day (A342), and statements on March 25, 2021 that Archegos had $10 billion in equity, and $120 billion in gross exposure, more specifically $70 billion in long exposure and $50 billion in short exposure (A343).[6] Defendants could not trade on this information, however, until Defendants issued notices of default. *See* A343-44. Accordingly, Archegos did not understand that Defendants would trade on this MNPI until March 26, 2021, when Defendants formally issued notices of default and took control of Archegos's portfolio. *Id*. Indeed, during the Hwang trial,[7] Will Tomita, Archegos's then-Head of Trading (Tr. 3037:15-20), testified that Defendants did not seize and liquidate Archegos's positions until ***March 26, 2021***

---

[6]     It is not clear what the district court considered to be the confidential information allegedly misappropriated by Defendants. *See* SPA37-39. To the extent the district court held that the allegedly misappropriated information was not confidential because it belonged to the Issuers, that conclusion is erroneous for the reasons set forth in Section I, *supra*.

[7]     As set forth in footnote 2, *supra*, this Court can take judicial notice of sworn testimony in the Hwang trial because the testimony occurred after the First and Second Dismissal Orders (respectively A1-21, A23-41) and is a judicial record in a related action.

(Tr. 3578:3-22 ("the counterparties seized control of our positions over the course *of Friday[, March 26, 2021]*")).

Defendants, however, breached their duty to Archegos by beginning to trade Archegos positions *on March 24, 2021*, *i.e.*, before they were allowed to under the terms of their swap agreements and on the basis of the MNPI they learned that day and the day after. A360. Since Defendant Morgan Stanley had MNPI that it could not trade on until March 26, 2021, and traded on it a day earlier without telling Archegos or its own counterparties, Defendant Morgan Stanley violated the Exchange Act.

Even though the SAC contained these textbook insider trading allegations, the district court nevertheless dismissed the complaint on the ground that Plaintiffs "fail[] to adequately allege . . . that Archegos tipped defendants with confidential information" because Defendants were "entitled by contract to seize and sell [Archegos]'s margin or collateral and to unwind its transactions with [Archegos] in the event of default" and thus Archegos "did not have 'exclusive use' of the alleged confidential information." SPA37-38. As set forth above, however, this was an error because Defendants received MNPI on March 24 and 25, 2021, at a time that they did not have the right to trade it because *they had yet to declare an event of default*. A343-44. Accordingly, Archegos still had "exclusive use" of the MNPI disclosed over those two days. *Id.*

For the same reason, the district court was incorrect that Defendants had effectively "disclosed" their trades to Archegos before trading (*i.e.*, because Archegos ostensibly knew that Defendants would trade immediately on an event of default). SPA37-38. As reported in the press, alleged in the SAC, and attested to at the Hwang trial, Defendants traded on March 25, 2021 ***before issuing notices of default***, and thus Archegos had neither notice nor expectation of these trades. Likewise, while the district court held that the SAC itself alleged Archegos's knowledge of Defendants' trading Archegos's positions (SPA39 (citing A348)), the district court overlooked that Archegos had this expectation upon ***receiving a notice of default*** (*see* A348). Archegos thus had no notice of the fact that Defendants would trade either Archegos's positions or Defendants' proprietary shares in advance of issuing a default notice.

Further, the district court was simply incorrect that Defendants owed no duty of confidentiality to Archegos or that Archegos did not consider the information it was disclosing – particularly its gross, long, and short exposures across all counterparties – to be confidential, in part because Archegos itself scheduled the March 25, 2021 call ("March 25 Call"). SPA37-38. As an initial matter, the district court's inference concerning the March 25 Call was an improper inference on Defendants' behalf. *See Iwa Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 147 (2d Cir. 2021) (reversing dismissal because court favored its own

53

alternative innocent inferences). The district court's inference is also inconsistent with the SAC, which alleges that information Archegos shared with its counterparties – including on the March 25 Call (A343-45) – was confidential based on "the parties' history, pattern, practice, course of dealing, or relationship with regard to the prime brokerage, margin lending, and other brokerage-client relationships, services, and transactions," as well as Defendants' "own corporate policies and practices" with regard to those transactions between them and Archegos (A344-45, A364-66). Indeed, Defendants' internal counsel were present on calls during this period "and read a script making clear that none of them were permitted to disclose their specific Archegos related positions" because of the highly confidential discussions. A344. These allegations are corroborated by Hwang trial testimony, where both Tomita and a Goldman Sachs representative testified that Archegos always considered its exposure across all counterparties to be highly confidential. Tr. 2644:8-22 (Goldman Sachs representative testifies that "they had historically not told us anything about their positions held at other dealers"); Tr. 4077:23-4078:16 (Tomita testifies that "We did not -- I did not talk about, like, the positions we had on at other counterparties").

### B. Defendants Are Liable as Tippers for Sharing Archegos's MNPI with Customers Who Subsequently Traded

In dismissing the SAC, the district court held that Plaintiffs failed to sufficiently allege that Defendants tipped certain preferred clients in breach of a duty

of confidentiality to Archegos because Plaintiffs could not identify the time, place, and manner of each tip or allege specific individual trades by tippees. SPA39-40. This was an error, however, because it required Plaintiffs to meet a super-heightened pleading standard far above what is required for securities fraud claims. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (reversing dismissal where district court "mistake[s] heightened pleading standards for impossible ones"). Indeed, this Court has long held that the heightened pleading standard for securities fraud claims under Rule 9(b) and the PSLRA does ***not*** require Plaintiffs to allege "the exact date and time" nor the precise method by which information is communicated to state a claim for securities fraud. *See Rombach v. Chang,* 355 F.3d 164, 175 n.10 (2d Cir. 2004) (plaintiffs need not "specifically allege the method by which defendants conveyed the fraudulent information" at the pleading stage); *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000) ("Appellants do not have to fix the exact date and time that GT and its officers became aware that recovering royalty payments through future sales would be unlikely"); *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 475 (S.D.N.Y. 2017) ("plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based"), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018).

The district court compounded this error by failing to properly credit the SAC's detailed tipping and trading allegations, which are sufficient to state a claim for securities fraud given that the information the district court (improperly) held that Plaintiffs needed to allege is exclusively in Defendants' possession. *Rombach,* 355 F.3d at 175 n.10 (plaintiffs are not required to allege "information [that] is likely to be exclusively within the control of defendants"); *SEC v. Afriyie*, No. 16-CV-2777 (JSR), 2018 WL 6991097, at *2 (S.D.N.Y. Nov. 26, 2018) (particularity standard "is 'relaxed' in insider trading cases 'where specific facts are peculiarly within the knowledge of defendants'"). For example, the SAC alleges: (1) the trading volumes for each of the Issuers' shares spiked **on March 24, 2021** (*i.e.*, **before** any Defendant issued a notice of default) far exceeding their median trading volumes (*see* A360-61); (2) this spike in trading is a tell-tale sign of front-running of the Morgan Stanley Fade, which was never disclosed to Archegos (*id.*); (3) Passi oversaw these sales which caused the trading volumes to spike (*id.*); and (4) Defendant Morgan Stanley ultimately terminated Passi (and other employees) for front-running (A362-63).

Specifically, on March 24, 2021, just before a block trade of Discovery was priced, its shares dropped almost 14%. A360. When Passi made another block trade of Discovery shares the next day, on March 25, 2021 the price dropped 7.2%. A361. While Archegos was aware of the block trade of Discovery shares, Defendant Morgan Stanley did ***not*** disclose that it was front-running and selling its ***proprietary***

*non-collateral shares* and tipping preferred clients. *See* A360-61 (March 24 trading volume spike reflected front-running block trades and sales by tipped-off hedge funds).

Testimony from the Hwang trial corroborates the substance and timing of these allegations. For example, on March 24, 2021 (again, before any Defendant issued a notice of default (*see* A343-344), Tomita (Tr. 3037:15-20), complained to Patrick Halligan, Archegos's then-CFO, that brokers, *i.e.*, Defendants, already were "picking our trades apart . . . our whole long book" and "liquidat[ing] our positions without telling us" (Tr. 4150:8-16), in other words, front-running. Similarly, Scott Becker, Archegos's then-Director of Risk Management (*see* Tr. 802:9-12), testified that on March 24, 2021, Archegos disclosed to each of its counterparties that it would not be able to meet margin calls by the deadline of the end of March 25 (*see, e.g.*, Tr. 1133:16-25, 1136:3-1137:23).

The district court further erred by inferring from the SAC's allegations that trades *by Archegos* caused the spike in trading activity on March 24, 2021, not Defendants' alleged front-running. *See* SPA40. This was erroneous because a plaintiff is not required to show that its theory is superior to the district court's alternative theories at the pleading stage. *See Textron Inc.*, 14 F.4th at 147 (reversing dismissal because court favored its own alternative innocent inferences); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169-70 (2d Cir. 2021) (reversing dismissal

57

and holding courts must credit a plaintiff's theory of the case on a motion to dismiss, not adopt defendants' (or court's) reinterpretation of plaintiff's theory); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93-94 (2d Cir. 2016) (reversing dismissal when the district court misconstrued facts pled in the complaint and the specific nature of the allegations). Hwang trial testimony also amplifies this error. For example, a representative of one of Archegos's counterparties testified that they did not see significant trading by Archegos on March 25, 2021 and a consultant for Archegos testified that a representative of Defendant Goldman Sachs had called to complain that Archegos's trading activity was not sufficient to meet their pending Margin Call. *See, e.g.*, Tr. 252:24-253:14, 551:11-15. In other words, Archegos's trading on March 25 was too limited to cause such severe price declines, and Plaintiffs' allegations that Defendants had tipped hedge fund clients should be credited.

## III. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' CLAIMS UNDER §§20A AND 20(a)

The district court dismissed Plaintiffs' §§20A and 20(a) control claims on the sole ground that there was no underlying §10(b) claim. SPA40. To the extent this Court reverses any portion of the underlying dismissal, that ground disappears and the §§20A and 20(a) claims should be reinstated. *See, e.g., Qihoo 360*, 19 F.4th 145, 152 ("the district court erred when it held that the appellants failed adequately to allege a [§10b claim] . . . We therefore vacate the district court's dismissal of the §20(a) and §20A claims as well.").

58

## CONCLUSION

The district court's dismissal warrants reversal.


DATED:  August 9, 2024                    Respectfully submitted,

                                          */s/ Michael I. Fistel, Jr.*
                                          Michael I. Fistel, Jr.  (*pro hac vice*)
                                          **JOHNSON FISTEL LLP**
                                          40 Powder Springs Street
                                          Marietta, Georgia 30064
                                          Telephone: (470) 632-6000
                                          michaelf@johnsonfistel.com

                                          *Attorneys for Plaintiff-Appellant Alexander Shapovalov*

                                          David W. Hall
                                          **THE HALL FIRM, LTD.**
                                          Four Embarcadero Center, Suite 1400
                                          San Francisco, CA 94104
                                          Telephone: (415) 766-3534
                                          dhall@hallfirmltd.com

                                          *Attorney for Plaintiff-Appellant Jeffrey Wachtel*

                                          Brian Calandra
                                          **POMERANTZ LLP**
                                          600 Third Avenue. 20th Floor
                                          New York, NY 10016
                                          Telephone: (212) 661−1100
                                          bclandra@pomlaw.com

                                          *Attorney for Plaintiffs-Appellants Zhang Zhenming, Kai Chen, Felix Urman, and the Kellner Newcomer Family Partnership*

                                          Daniel Lawrence Berger

59

**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
dberger@gelaw.com

*Attorney for Plaintiffs-Appellants Oklahoma Firefighters Pension and Retirement System, Oklahoma Law Enforcement Retirement System, and Kevin Lee*

Max Raphael Schwartz
**SCOTT & SCOTT,
ATTORNEYS AT LAW, LLP**
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
mschwartz@scott-scott.com

*Attorney for Plaintiff-Appellant Yan Cai Jiang*

Alan L. Rosca
**ROSCA SCARLATO LLC**
2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Los Angeles, CA 90067
Telephone: (216) 946-7070
arosca@rscounsel.law

*Attorney for Plaintiff-Appellant Syed Zaheer*

Michael Dell'Angelo
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3080
mdellangelo@bm.net

*Attorney for Plaintiff-Appellant Syed Zaheer*

60

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.     The foregoing motion complies with the length limit under Local Rule 32.1(a)(4) because it contains 13,736 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f); and

2.     This foregoing motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

/s/ *Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.

*Attorney for Plaintiff-Appellant Alexander Shapovalov*

DATED: August 9, 2024