# 24-1162-cv(L)

## 24-1159(CON), 24-1161(CON), 24-1166(CON), 24-1173(CON), 24-1177(CON), 24-1178(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖

IN RE: ARCHEGOS 20A LITIGATION

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**APPELLEE BRIEF OF DEFENDANTS-APPELLEES
GOLDMAN SACHS GROUP, INC. AND MORGAN STANLEY**

---

CARMINE D. BOCCUZI, JR.
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Counsel for Defendant-Appellee
  Goldman Sachs Group, Inc.*

CHARLES S. DUGGAN
DANIEL J. SCHWARTZ
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Counsel for Defendant-Appellee
  Morgan Stanley*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Goldman Sachs Group, Inc. ("GS Group") hereby states that it is a corporation organized under the laws of Delaware, and its shares are publicly traded on the New York Stock Exchange. GS Group has no parent corporation, and to the best of GS Group's knowledge, no publicly held company owns 10% or more of the common stock of GS Group.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Morgan Stanley hereby states that it is a publicly held corporation that has no parent corporation. Based on Securities and Exchange Commission Rules regarding beneficial ownership, Mitsubishi UFJ Financial Group, Inc., 7-1 Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-8330, beneficially owns greater than 10% of Morgan Stanley's outstanding common stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ....................................................................iv

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF THE ISSUES................................................................5

STATEMENT OF THE CASE.................................................................6

    A.   Plaintiffs Allegedly Purchase Shares of Seven Issuers to Which Archegos Has Exposure ....................................................6

    B.   Archegos Allegedly Engages in Transactions with Defendants ........................................................................7

    C.   In March 2021, After Its Positions Fell in Value, Archegos Defaults and Defendants Exercise their Contractual Remedies ...............................................................11

    D.   Aftermath of Archegos's Collapse...........................................12

PROCEDURAL HISTORY...................................................................14

SUMMARY OF ARGUMENT ..............................................................17

STANDARD OF REVIEW ..................................................................20

ARGUMENT ...............................................................................21

    I.    The District Court Correctly Held that Plaintiffs Failed to Allege a "Tippee" Claim Under the Classical Theory of Insider Trading ....................................................................21

        A.   Plaintiffs Fail to Allege that Archegos Owed a Duty to the Issuers...................................................................22

        B.   Plaintiffs Fail to Allege that Archegos Tipped Inside Information in Breach of Any Duty to the Issuers ..................29

II.   The District Court Correctly Determined that Plaintiffs Did Not Allege Any Claim Under the Misappropriation Theory of Insider Trading ......................................................................... 37

      A.    Plaintiffs Fail to Allege that Defendants Owed or Breached Any Duty to Archegos ................................................ 37

      B.    Plaintiffs Fail to Allege that Defendants Tipped Archegos's Confidential Information to Customers ................. 42

III.  The District Court Properly Dismissed Plaintiffs' Claims Under Sections 20A and 20(a) Because Plaintiffs Failed to Plead Any Primary Violation ................................................................... 48

CONCLUSION ...................................................................... 49

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .......................................................... 20, 48

*Andrews v. Metro N. Commuter Ry. Co.*,
882 F.2d 705 (2d Cir. 1989) .............................................................. 10

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
No. 18 C 6175, 2020 WL 60186 (N.D. Ill. Jan. 6, 2020) .................. 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 40

*ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .............................................................. 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 44

*Carpenter v. United States*,
484 U.S. 19 (1987) ........................................................ 32, 33, 37–38

*Chiarella v. United States*,
445 U.S. 222 (1980) .................................................................. *passim*

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021) ............................................. 48

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) .............................................................. 13

*Crane v. Westinghouse Airbrake Co.*,
419 F.2d 787 (2d Cir. 1969) ............................................................ 26

*de Kwiatkowski v. Bear, Stearns & Co.*,
306 F.3d 1293 (2d Cir. 2002) .......................................................... 40

*DeMarco v. Robertson Stephens Inc.*,
318 F. Supp. 2d 110 (S.D.N.Y. 2004) .............................................. 24

*Dirks v. SEC*,
463 U.S. 646 (1983) ............................................................... *passim*

*Donoghue v. Bulldog Invs. Gen. P'ship*,
696 F.3d 170 (2d Cir. 2012) ............................................ 18, 27, 28

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ...................................................... 43

*In re FBR Inc. Secs. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) .......................................... 46

*Feldman v. Simkins Indus., Inc.*,
679 F.2d 1299 (9th Cir. 1982), *overruled in part on other grounds by In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 823 F.2d 1349 (9th Cir. 1987) ..... 24

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
423 U.S. 232 (1976) .................................................................. 28

*Gamm v. Sanderson Farms Inc.*,
944 F.3d 455 (2d Cir. 2019) ...................................................... 21

*Gruber v. Gilbertson*,
No. 16-CV-9727, 2021 WL 2482109 (S.D.N.Y. June 17, 2021) .............. 22, 26

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
286 F.3d 613 (2d Cir. 2002) ................................................ 18, 28

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019) .......................................................... 6

*Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
157 F.3d 933 (2d Cir. 1998) ...................................................... 40

*Indiana Public Retirement System v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ........................................................ 46

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ........................................................46

*Jackson Nat'l Life Ins. v. Merrill Lynch & Co.*,
32 F.3d 697 (2d Cir. 1994) ........................................................ 48

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) .................................................. 39

v

*Moss v. Morgan Stanley Inc.*,
719 F.2d 5 (2d Cir. 1983) ........................................................ 18, 24, 40

*Noto v. 22nd Century Grp.*,
35 F.4th 95 (2d Cir. 2022) ................................................................. 40

*Press v. Chem. Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999) .............................................................. 40

*Reed v. Riddle Airlines*,
266 F.2d 314 (5th Cir. 1959) ............................................................. 26

*Rogen v. Ilikon Corp.*,
361 F.2d 260 (1st Cir. 1966) ............................................................. 27

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .............................................................. 45

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ................................................................ 46

*Salman v. United States*,
580 U.S. 39 (2016) ................................................................... *passim*

*Sawant v. Ramsey*,
742 F. Supp. 2d 219 (D. Conn. 2010) ................................................ 23

*SEC v. Afriyie*,
No. 16-CV-2777 (JSR), 2018 WL 6991097 (S.D.N.Y. Nov. 26, 2018) .......... 43

*S.E.C. v. Alexander*,
160 F. Supp. 2d 642 (S.D.N.Y. 2001) ................................................ 43

*Steginsky v. Xcelera Inc.*,
741 F.3d 365 (2d Cir. 2014) ......................................................... 17, 23

*Sulton v. Wright*,
265 F. Supp. 2d 292 (S.D.N.Y. 2003) ................................................ 10

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) .............................................................. 46

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ................................................................ 6

vi

*United States v. Carpenter*,
  791 F.2d 1024 (2d Cir. 1986), *aff'd in part and aff'd by an equally divided court in part*, 484 U.S. 19 (1987) ............................................................ 35

*United States v. Chestman*,
  947 F.2d 551 (2d Cir. 1991) ................................................... 34, 40

*United States v. Chiarella*,
  588 F.2d 1358 (2d Cir. 1978), *rev'd*, 445 U.S. 222 (1980) ............................. 35

*United States v. Falcone*,
  257 F.3d 226 (2d Cir. 2001) ........................................................ 41

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) ......................................................... 41

*United States v. Martoma*,
  894 F.3d 64 (2d Cir. 2017) ................................................ 18, 21, 30

*United States v. O'Hagan*,
  521 U.S. 642 (1997) .......................................................... *passim*

*United States v. Pinto Thomaz*,
  352 F. Supp. 3d 287 (S.D.N.Y. 2018) .............................................. 33

*Veleron Holding, B.V. v. Morgan Stanley*,
  117 F. Supp. 3d 404 (S.D.N.Y. 2015) ............................................. 21

*Walton v. Morgan Stanley & Co.*,
  623 F.2d 796 (2d Cir. 1980) ....................................................... 40

*Wellman v. Dickinson*,
  682 F.2d 355 (2d Cir. 1982) ....................................................... 28

*XY Planning Network LLC v. U.S. S.E.C.*,
  963 F.3d 244 (2d Cir. 2020) ....................................................... 40

### STATUTES & RULES

15 U.S.C. § 78j(b) ................................................................... 5

15 U.S.C. § 78p(b) ................................................................. 27

15 U.S.C. § 78t(a) .................................................................. 6

15 U.S.C. § 78t-1 .................................................................. 6

vii

15 U.S.C. § 78u-4(b) ............................................... 20

17 C.F.R. § 240.10b5-1 ............................................ 34

17 C.F.R. § 240.10b-5 ............................................. 5

Fed. R. Civ. P. 9(b) ................................................ 20

O<small>THER</small> A<small>UTHORITIES</small>

*In re Oppenheimer & Co.,*
    SEC Release No. 508, 1976 WL160384 (SEC Apr. 2, 1976) ........................... 34

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws,*
    93 Harv. L. Rev. 322 (1979) ............................................. 36

## PRELIMINARY STATEMENT

These coordinated appeals arise from the district court's dismissal of plaintiffs-appellants' Second Amended Complaint,[1] their third attempt to recast defendants-appellees Goldman Sachs Group's and Morgan Stanley's arm's-length close-outs of their contractual relationships with defaulting counterparty Archegos Capital Management LLC ("Archegos") as insider trading. The decisions below by two experienced district court judges (Crotty and Rakoff, JJ.) correctly held that the complaints failed to state a claim. The dismissal of these actions should be affirmed.

As alleged in the SAC, Archegos, through swaps and margin accounts with defendants and other dealers, acquired large, mostly derivative exposure to the seven stocks at issue. Defendants, following standard industry practice, hedged the swap positions by buying shares of the underlying stocks in order to remain risk-neutral. As share prices moved against Archegos during the week of March 22, 2021, Archegos asked defendants to liquidate certain of its positions, but ultimately could not meet defendants' margin calls and defaulted. In an effort to dissuade defendants and its other counterparties from closing out their contracts and exiting

---

[1] "Second Amended Complaint" or "SAC" refers to the Second Amended Class Action Complaint filed in *Tan v. Goldman Sachs Group, Inc.*, No. 1:21-cv-08413 (S.D.N.Y.). A284–396. *Tan v. Goldman Sachs Group, Inc.*, No. 24-1162, was designated the lead appeal of these consolidated appeals.

their hedges as they ordinarily would in response to a default, Archegos convened a call on the evening of March 25, 2021 to ask them not to exercise those contractual rights and instead to enter into a managed liquidation plan. Defendants did not agree to forbear, and the next day, delivered notices of default, after which they liquidated their collateral and exited their swap hedges. Following its collapse, Archegos was charged by the SEC and CFTC, and its principals were criminally prosecuted by the U.S. Department of Justice for, among other things, lying to Archegos's various counterparties, including defendants, in the course of committing market manipulation.

Plaintiffs—investors in the seven stocks at issue—assert that defendants' contractual close-outs of their positions associated with Archegos amounted to insider trading. But, as the decisions below properly determined, the factual allegations in the SAC cannot support insider trading on either a "classical" tipping or a "misappropriation" theory.

*First*, plaintiffs' tipping theory fails because plaintiffs did not allege that Archegos had any confidential corporate information of any of the seven issuers, let alone that it provided such information to defendants in violation of a duty of trust and confidence that Archegos owed the issuers. To the contrary, the *only* information Archegos allegedly shared with defendants was *Archegos's own information*—the securities and swaps it held with each defendant, as well as

2

general information about its liquidity and capital. As the SAC acknowledges, Archegos provided the information to defendants because it was required to under the terms of its trading agreements with them and because it voluntarily sought to induce them *not* to sell.

In holding, correctly, that plaintiffs had failed to allege that Archegos owed any duty to the issuers not to share its own information, the district court did not, as plaintiffs claim, redefine the meaning of "material nonpublic information" to broadly exclude market intelligence or other third-party information. Instead, it faithfully applied insider trading precedent requiring that the alleged "tipper," here, Archegos, misuse the exclusive corporate information of the issuers in violation of a duty of trust and confidence. The SAC is devoid of well-pleaded allegations of such facts (and none exist), and the district court correctly concluded that plaintiffs' tipping claims based on "classical" insider trading theory failed. The claims likewise fail for the additional reason (which the district court had no need to reach) that the SAC lacks factual allegations that *defendants* knew Archegos owed or breached any duty to the issuers when it provided them with information about itself.

*Second*, plaintiffs' alternative "misappropriation" theory fails. Plaintiffs now concede that defendants' alleged trades on or after March 26, 2021 were entirely lawful, instead asserting that defendants improperly traded *before* March

3

26, and that defendants purportedly tipped preferred clients in advance of executing block trades for Archegos on March 24 and 25. But as the district court correctly determined, plaintiffs failed to identify any duty of trust and confidence that defendants owed or violated. The reason for that is straightforward: the purportedly confidential information that Archegos provided defendants was either information defendants were contractually entitled to know and act upon as counterparties, or information that Archegos voluntarily shared in asking defendants *not* to exercise their contractual rights to unwind their exposures to Archegos. The SAC makes clear that defendants did not agree to Archegos's request, that Archegos knew that, absent such an agreement, defendants and its other counterparties could and would trade, and that defendants disclosed their intention to trade to Archegos. These basic admissions defeat any suggestion that defendants had or breached any duty to Archegos. Plaintiffs cannot overcome these fundamental defects with conclusory statements about the parties' history of dealing or defendants' policies. Nor can plaintiffs plead insider trading, as the district court correctly held, through implausible, nonparticularized, and factually unsupported assertions that defendants tipped Archegos's information to unspecified others who allegedly engaged in trading activity that the SAC nowhere identifies.

4

Plaintiffs' failure to allege insider trading violations on *any* theory dooms their Section 20A and control person claims. And because plaintiffs already amended their complaints in response to a prior motion to dismiss that was granted by a different judge, the district court properly dismissed the claims with prejudice. This Court should affirm.

## STATEMENT OF THE ISSUES

1.    Did the district court correctly determine that plaintiffs had not alleged any insider trading "tipping" violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, where defendant swap participants and margin lenders were not alleged to have received from their non-insider counterparty any confidential information in violation of any duty it owed to any other person, but instead allegedly received only their counterparty's *own* information, which, upon their counterparty's default, defendants allegedly used to exercise their contractual rights to terminate their agreements and liquidate their associated hedge positions?

2.    Did the district court correctly determine that plaintiffs had failed to allege any insider trading "misappropriation" violations of Section 10(b) and Rule 10b-5 where, as noted above, defendants—as acknowledged by their defaulted trading counterparty—allegedly acted pursuant to their contractual rights in liquidating their hedge positions in the relevant issuers' stock, otherwise acted

5

without deception by disclosing their trading to the counterparty from whom they allegedly obtained confidential information, and where plaintiffs did not allege any factual support for their conclusory assertions that defendants engaged in front-running or tipping of preferred customers?

3.    Did the district court correctly dismiss plaintiffs' insider trading and control person claims under Sections 20A and 20(a) of the Exchange Act, 15 U.S.C. §§ 78t-1, 78t(a), where plaintiffs failed to allege a viable insider trading violation of Section 10(b) and Rule 10b-5?

## STATEMENT OF THE CASE[2]

### A.    Plaintiffs Allegedly Purchase Shares of Seven Issuers to Which Archegos Has Exposure

Lead Plaintiff Alexander Shapovalov allegedly bought shares of Vipshop Holdings Ltd.  A298 ¶ 24.  He purports to represent a putative class of Vipshop investors who purchased shares from March 22 to March 29, 2021 (the "Class

---

[2]   The facts are drawn from the well-pleaded factual allegations in the SAC (which are accepted as true solely for purposes of this appeal), documents incorporated in the SAC by reference, documents known to plaintiffs and on which they relied in bringing suit, and matters of which the Court may take judicial notice.  *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019); *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

Period.")  A294 ¶ 16.  Plaintiffs in the coordinated actions seek to represent similar classes of investors who purchased stock in six other companies at similar times.[3]

### B.  Archegos Allegedly Engages in Transactions with Defendants

Archegos is allegedly the "family office" of trader Sung Kook (Bill) Hwang. A298 ¶ 27, A300 ¶ 33.  Archegos allegedly engaged in margin trading and total return swaps with several counterparties, including defendants.  A298 ¶¶ 25–26, A301–04 ¶¶ 37–54.  Margin lenders extend credit in exchange for pledges of marketable securities or cash in a borrower's account.  A304 ¶¶ 49–54. Archegos's margin lenders could make "margin calls," i.e., require it to pledge additional capital if the value of the assets securing its loans declined.  A291 ¶ 9, A304 ¶ 52, A339 ¶ 135, A341 ¶ 147.  Failure to satisfy a margin call may constitute an event of default and entitle the lender to sell the securities pledged as collateral.  A343 ¶ 154.

Archegos also allegedly entered into swaps with various counterparties, including defendants.  A303 ¶ 47.  A swap is a derivative contract that enables a party (here, Archegos) to gain synthetic long exposure to a stock—i.e., to get the financial benefits of owning the stock, such as price appreciation and dividend payments—without actually buying it.  A301 ¶ 40.  The parties to the swap agree

---

[3]  As alleged in the SAC, A288 ¶ 2, the other six companies are GSX Techedu Inc., Tencent Music Entertainment Group, ViacomCBS Inc., IQIYI Inc., Baidu Inc., and Discovery Inc.

that if the price of the referenced security goes up, the long party (here, Archegos) receives the increase in value; if the price falls, the long party must pay its counterparty (here, defendants and other dealers) to make up for the decline. *Id.* In the event of a price decline, the long party may be required to post cash or other collateral, also known as "margin," in response to a demand, or margin call, from its counterparty. *Id.* A failure to post margin may constitute a default and entitle the counterparty to terminate the swap. A343 ¶ 154.

Plaintiffs allege that, in keeping with industry standards, defendants hedged their swaps with Archegos by purchasing the referenced stock in an amount "mirroring" the swap, so as to be "market neutral"—i.e., so the amount they would owe Archegos if the price rose would be covered by the increased value of the stock that they held as a hedge. A302 ¶¶ 41–42, A334 ¶ 123, A378 ¶ 261. The alleged total amount of actual stock (or collateral) that Archegos owned amounted to 5% of the outstanding stock for each issuer, at most. A318 ¶ 94. The remaining Archegos-related shares were hedges held by Archegos's counterparties. A302 ¶ 41, A318 ¶ 94, A334 ¶ 123.

Plaintiffs generally allege that parties to swap and/or margin lending agreements will typically acquire certain information from their counterparties, such as information about a client's liquidity and exposures. A306 ¶¶ 59–60. As to Archegos's swap and/or margin lending agreements with defendants, however,

8

plaintiffs fail to allege any details about what information Archegos supposedly provided, when, or to whom. Plaintiffs instead allege that defendants received unspecified information "[i]n the course of providing . . . services, and through their respective . . . agreement[s] and contractual relationship with Archegos." A330 ¶ 117. Each defendant allegedly knew what positions Archegos held with it individually, A334–36 ¶ 125, but as plaintiffs acknowledge, defendants "may not have known the exact amount of Archegos's aggregate positions" across the many counterparties with which it dealt, A338 ¶ 133.

Plaintiffs allege that the unspecified information that defendants received from Archegos throughout their commercial relationship was confidential. A330 ¶ 117. But as alleged in the amended complaints, this information was simply that (i) each defendant knew that Archegos held large swap positions with it, (ii) as those positions got larger, each defendant "increased margin requirements and similar terms," and (iii) when Archegos's positions moved against it, defendants made "escalating margin calls." A331–33 ¶ 118. Although plaintiffs assert—in purely conclusory terms—that defendants also knew that Archegos was seeking to evade SEC reporting rules and was engaged in manipulative trading, *id.*, the SAC fails to support these allegations with any concrete facts. Instead, the SAC quotes liberally from an internal investigation report prepared for a *different counterparty* (Credit Suisse) having nothing to do with defendants, without any factual

allegations that defendants had ever suspected evasion or market manipulation by Archegos.  A289 ¶ 5, A333 ¶ 119, A334–37 ¶¶ 125, 127–29, A338–39 ¶¶ 133–38, A342–43 ¶ 152; *see also, e.g.*, A56 ¶ 5, A145–46 ¶ 231.[4]

The SAC does not allege that Archegos received any information from the issuers, or that it owed them any fiduciary or other special duty of trust and confidence.  Instead, plaintiffs assert in conclusory fashion that Archegos's large swap positions made it an "insider" of the issuers and subjected it to trading and non-disclosure obligations.  A289–90 ¶¶ 5–6, A313–15 ¶¶ 81–84.  But, plaintiffs do not suggest that Archegos did (or could do) anything that typically makes an "insider" an "insider," such as voting shares of stock or controlling the issuers' decisions.  Rather, plaintiffs admit that the issuers did not know of Archegos's swap positions, A320 ¶ 100, and plaintiffs do not allege that anyone from the issuers ever interacted with Archegos.

---

[4]  Plaintiffs' attempt to replace references to Credit Suisse in the First Amended Complaint with references to defendants or other counterparties in the SAC is unavailing.  *See Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) (holding that "[a]dmissions in earlier complaints remain binding when a plaintiff files subsequent pleadings" and that courts therefore "may consider them on a motion to dismiss under Rule 12(b)(6)" (citing, *inter alia*, *Andrews v. Metro N. Commuter Ry. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)).

### C. In March 2021, After Its Positions Fell in Value, Archegos Defaults and Defendants Exercise their Contractual Remedies

As of March 2021, Archegos allegedly had acquired "highly concentrated" exposures to the stocks of a small number of companies. A313–16 ¶¶ 81–86. Early in the week of March 22, 2021, the price of some of the stocks fell sharply. A340–41 ¶¶ 142–45. Archegos's positions declined by billions of dollars, which prompted margin calls from its counterparties to cover the losses. A341 ¶¶ 147–48. Over the course of March 24, Archegos allegedly "directed hundreds of millions of dollars of additional trading." A341 ¶ 146. Archegos at first managed to post additional collateral, but following further stock price declines, it allegedly told each defendant after the market closed on March 24 that it could not satisfy the margin calls expected on March 25. A341–42 ¶¶ 148, 150.

Although Archegos allegedly further sold billions of dollars of its positions via block trades arranged by defendants on March 25 to try to meet its margin calls, A342 ¶ 151, A352 ¶¶ 178–79, A361 ¶ 206, Archegos remained unable to satisfy them, and that night, Archegos allegedly organized a call with defendants and other counterparties "in an attempt to thwart a large scale liquidation," A343 ¶ 153. According to the SAC, during that call Archegos revealed to these counterparties that its gross exposure exceeded its capital by billions of dollars. *Id.* Archegos allegedly asked its counterparties to "agree not to declare Archegos in default while it wound down its positions in an orderly manner." *Id.* Plaintiffs

11

contend that Archegos's changing financial position during the week of March 22 and the contents of the March 25 call were part of the material non-public information ("MNPI") that Archegos purportedly provided. A344–45 ¶¶ 158–59.

Plaintiffs allege that between the evening of March 25 and morning of March 26, several of Archegos's key margin lenders and swap counterparties, including defendants, "triggered events of default or early termination rights against Archegos." A343–44 ¶ 155, A352–53 ¶ 180. Defendants thereafter sold "very large amounts of the Issuers' stock, both their proprietary hedged shares and Archegos's collateral." A343–44 ¶ 155, A353–54 ¶¶ 181–87. According to plaintiffs, discussions about "the possibility of a managed liquidation" continued into the weekend. A344 ¶ 156. Plaintiffs allege that on March 27, internal counsel for defendants and other counterparties "read a script making clear that none of them were permitted to disclose their specific Archegos related positions." *Id.* This is the only restriction purportedly agreed to during the calls. Plaintiffs allege that Morgan Stanley continued to sell shares in the issuers' stock on March 28 and March 29. A354 ¶¶ 186–87.

### D. Aftermath of Archegos's Collapse

In 2022, the U.S. Department of Justice indicted Hwang and other Archegos executives, some of whom pleaded guilty, A373 ¶ 251, and the U.S. Securities and Exchange Commission and U.S. Commodity Futures Trading Commission filed

civil complaints against Archegos, Hwang, and others, A374 ¶ 252. The

indictment and complaints in these proceedings (which plaintiffs reference

extensively) allege that Archegos engaged in a manipulative scheme to dominate

trading in the issuers' stocks, and that Archegos used swaps to circumvent

reporting obligations under Section 13 of the Exchange Act. A373–74 ¶¶ 251–55.

The DOJ's indictment and the SEC's and CTFC's complaints—which were the

source of plaintiffs' allegations, *see*, *e.g.*, A425 n.7—allege that Archegos

repeatedly gave its counterparties, including defendants, false or incomplete

information and took steps to mislead them.[5]  On July 10, 2024, Hwang and

Archegos' former CFO Patrick Halligan were found guilty of criminal securities

fraud after a jury trial that began on May 13, 2014—long after the SAC was filed,

and over a month after Judge Rakoff's order dismissing the SAC with prejudice.

---

[5]    *See* DOJ Indictment ¶¶ 44–49, *United States v. Hwang*, No. 1:22-cr-00240-AKH (S.D.N.Y. Apr. 25, 2022), ECF No. 1 (explaining that Archegos "systematically misled the Counterparties in order to obtain additional trading capacity and margin lending"); SEC Compl. ¶ 94, *SEC v. Hwang*, No. 1:22-cv-03402 (S.D.N.Y. Apr. 27, 2022), ECF No. 1 (alleging that Archegos "gave materially false information to Counterparties, or omitted material information, regarding the concentration and liquidity of its portfolio"); CFTC Compl. ¶ 47, *CFTC v. Archegos Cap. Mgmt., LP*, No. 1:22-cv-03401 (S.D.N.Y. Apr. 27, 2022), ECF No. 1 (alleging that, "[r]ather than provide truthful information," Archegos "repeatedly misled Swap Counterparties about [its] aggregate positions"). This Court may refer to these filings because plaintiffs "relie[d]" on them in drafting and they are "integral to the amended complaint[s.]" *See, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991).

## PROCEDURAL HISTORY

These appeals involve seven coordinated actions alleging that defendants violated Sections 10(b), 20A, and 20(a) of the Exchange Act and Rule 10b-5 by purportedly engaging in insider trading in connection with Archegos's March 2021 default. Following the coordination order and the appointment of lead plaintiffs, A33–49, plaintiffs in each case filed a First Amended Complaint ("FAC"), A50–192. Like the operative Second Amended Complaint, the FAC asserted both (1) a tipper/tippee theory of insider trading, under which defendants allegedly breached a duty to the issuers by selling shares of the issuers' stock after they were tipped non-public information by Archegos about its exposures to those stocks; and (2) a misappropriation theory of insider trading, under which defendants allegedly breached their duty to Archegos by front-running the market and by tipping purportedly "preferred" clients once they learned of Archegos's imminent default.

*The District Court Dismisses the FAC and Grants Leave to Replead.* On March 31, 2023, the Honorable Paul A. Crotty granted defendants' motion to dismiss the FAC in its entirety. In rejecting plaintiffs' tipper/tippee theory, the court held that the complaints failed to allege any personal benefit Archegos received through its alleged "tipping," or that Archegos expected defendants to trade on the information. SPA17–18. In rejecting plaintiffs' misappropriation theory, the court declined to credit plaintiffs' "vague assertion" that defendants

14

tipped hedge fund clients, as plaintiffs "point[ed] to no specific sales connected with these tips, nor the circumstances of the tips themselves." SPA13 n.5. The court further held that, even assuming defendants owed a fiduciary duty to Archegos, plaintiffs failed to allege any trades executed by defendants in breach of any such duty, defeating a claim of misappropriation. SPA12–15. Finally, given its conclusion that plaintiffs failed to state a claim for a primary violation of the Exchange Act, the court dismissed the Section 20A and 20(a) claims. SPA19. The court granted plaintiffs leave to amend their tipper/tippee theory. SPA18.

Plaintiffs filed the SAC on May 16, 2023. Plaintiffs alleged that Archegos was an "insider" of the issuers because of the large positions it held, asserting that this status gave rise to duties to refrain from disclosing confidential information about the issuers. A289–90 ¶¶ 5–6, A313–15 ¶¶ 81–84. Plaintiffs also newly alleged that the unspecified information that defendants received from Archegos throughout their commercial relationship was MNPI on which defendants could not lawfully trade. A330 ¶ 117. Although the court only granted plaintiffs leave to amend their tipper/tippee theory, plaintiffs added allegations to their misappropriation theory as well, claiming that certain stock price and trading volume movements in March 2021 were putatively signs that defendants and their supposedly "preferred" clients were engaging in front-running trades based on Archegos's MNPI.

*The District Court Dismisses the SAC with Prejudice.* After defendants moved to dismiss the SAC, the actions were reassigned on February 29, 2024 to the Honorable Jed S. Rakoff. On March 28, 2024, the district court issued a bottom-line order again granting defendants' motion to dismiss in full, this time with prejudice, SPA22, and issued a further opinion and order on April 1, 2024 setting forth its reasoning, SPA 23–41. As to plaintiffs' tipper/tippee theory, the court held that plaintiffs failed to allege that defendants traded on any confidential information. The court explained further that even if the information Archegos disclosed to plaintiffs had been confidential, plaintiffs had again failed to allege that defendants traded in violation of any duty because Archegos was not an insider of the issuers and therefore owed no duty to the issuers. SPA33–37. The court rejected plaintiffs' misappropriation theory because plaintiffs failed to allege that Archegos provided defendants with confidential information, and in any event, because defendants disclosed their trades to Archegos before trading. SPA37–38. The court also held that, despite having three opportunities to do so, plaintiffs still failed to allege adequate facts supporting their alternative misappropriation theory that defendants tipped supposedly preferred clients prior to Archegos's collapse. SPA39–40.[6]

---

[6] The district court did not reach alternate grounds for dismissal raised by defendants, including that plaintiffs failed to allege facts supporting a strong

*(cont'd)*

## SUMMARY OF ARGUMENT

The district court properly dismissed the Second Amended Complaints with prejudice because plaintiffs failed to state a claim for insider trading.

*First*, plaintiffs' alleged tippee claims—which proceed under the "classical" theory of insider trading—fail because the complaints do not allege that Archegos owed or violated any duty of trust or confidence to the relevant issuers in sharing information with defendants. *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 41–42 (2016). The SAC fails to support its allegation that Archegos owed any duty as an insider of the issuers. Archegos is far from a quintessential insider—in fact, it allegedly had *no relationship with the issuers at all*. Moreover, the SAC does not allege the access and control necessary to impose insider trading duties. *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983); *Chiarella v. United States*, 445 U.S. 222, 227 (1980); *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014). Plaintiffs' conclusory claim that Archegos acquired insider status through its large derivative

_____

inference of scienter. The district court also did not reach defendants' argument that the Section 20A claims raised by the plaintiffs in two of the consolidated cases, *Felix* (IQIYI) and *Scully* (Baidu), must be dismissed because those plaintiffs failed to allege that they traded contemporaneously with the alleged primary violation. Finally, the district court did not reach defendants' argument that plaintiffs' Section 20(a) claims must be dismissed because plaintiffs failed to allege any control by defendants over the primary actors with respect to the conduct at issue. If this Court were to reverse the district court, those issues should be considered in the first instance by the district court on remand.

exposures runs headlong into their own allegations that the shares underlying the swaps were "proprietary" to defendants, who allegedly purchased and controlled them. Nor did plaintiffs allege any other source of the duty. Duties to avoid short-swing profits and make ownership reports under Sections 16(b) and 13(d) of the Exchange Act do not extend more generally to insider trading. *See Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 174, 177 (2d Cir. 2012); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619–20 (2d Cir. 2002).

Plaintiffs' classical tippee claims independently fail because plaintiffs never allege that Archegos *possessed* any of the issuers' inside corporate information, let alone shared it in violation of a duty of confidentiality. To be deceptive, tipping must involve the misuse of another's corporate information, as that information is intended for their exclusive use and benefit. *See, e.g.*, *Salman*, 580 U.S. at 41–42; *United States v. Martoma*, 894 F.3d 64, 73 (2d Cir. 2017). Plaintiffs allege that Archegos shared only its *own* information to facilitate its own trading relationships with defendants. Sharing one's own information for one's own business purposes involves no violation of a duty of trust or confidence to another. *See, e.g.*, *Dirks*, 463 U.S. at 654; *Chiarella*, 445 U.S. at 231; *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 13–14 (2d Cir. 1983). And of course, even if *Archegos* had somehow owed and breached a duty to the issuers, plaintiffs still fail to plead—as they must—that *defendants knew* that Archegos had done so. *Salman*, 580 U.S. at 42.

18

*Second*, plaintiffs' misappropriation claims are equally defective. Like their tippee claims, plaintiffs' claims that defendants unlawfully traded on Archegos's confidential information on March 24 and 25, 2021 fail for lack of any duty owed or breached by defendants. The complaints allege that defendants were arm's-length counterparties, not fiduciaries. The only information allegedly provided by Archegos was information that defendants were entitled to under their contracts, or information Archegos voluntarily provided in requesting that defendants consider delaying default. The very fact that Archegos convened a meeting to ask defendants not to trade demonstrates that Archegos was aware that defendants would lawfully trade absent an agreement not to. Plaintiffs plead no facts supporting the existence of any other agreement not to trade, and conclusory assertions about defendants' policies or history of dealing with Archegos cannot save their claims. And even if plaintiffs had alleged a duty, the district court correctly determined that plaintiffs' claims would independently fail because the SAC does not identify any trading that was not disclosed to Archegos.

The district court was also correct to hold that plaintiffs failed to plead any facts plausibly supporting their theory that defendants tipped favored clients. SPA37. Plaintiffs' naming of a single Morgan Stanley employee mentioned in news articles about investigations unrelated to Archegos, without any further factual allegations regarding his role in any allegedly unlawful trading—and with

19

no allegation at all as to Goldman Sachs—is nothing more than the boilerplate language the district court determined to be insufficient on both motions to dismiss. SPA13–14 n.5, 21, 39–40. Plaintiffs cannot save their claim by generally alleging that defendants "must have" tipped favored clients because trading volumes allegedly rose and prices fell. The SAC cannot survive a motion to dismiss based solely on such conjectural leaps and bare suppositions.

*Third*, because the district court properly dismissed the Section 10(b) and Rule 10b-5 violations, there was no primary violation to support an insider trading cause of action under Section 20A or a control person claim under Section 20(a). *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 152 (2d Cir. 2021).

The Court should affirm dismissal of the SAC with prejudice.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's order dismissing a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Under the Private Securities Litigation Reform Act and Federal Rule of Civil Procedure 9(b), plaintiffs are required to plead the alleged deceptive conduct with particularity, including "all facts" supporting allegations made on information and belief, 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b), and any purported undisclosed conduct underlying any omissions claim, *Gamm v. Sanderson Farms*

*Inc.*, 944 F.3d 455, 464–65 (2d Cir. 2019). Plaintiffs' allegations fail to state a claim for insider trading under these standards.

## ARGUMENT

Plaintiffs' insider trading claims suffer from multiple defects under any theory of liability. At their core, plaintiffs' insider trading claims fail because they are fundamentally incompatible with the basic definition of insider trading—the misuse of information in violation of a duty of trust and confidence—regardless of whether that duty is characterized as Archegos's alleged duty to the issuers (under the "classical" theory) or defendants' purported duty to Archegos (under the "misappropriation" theory). *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 46 n.2 (2016); *United States v. Martoma*, 894 F.3d 64, 73 (2d Cir. 2017).

## I. The District Court Correctly Held that Plaintiffs Failed to Allege a "Tippee" Claim Under the Classical Theory of Insider Trading

The district court correctly determined that plaintiffs failed to allege that Archegos owed or breached any duty to the issuers. To plead that a defendant is liable as a tippee, a plaintiff must allege that a corporate insider entrusted with a fiduciary duty breached that duty by improperly disclosing the corporation's confidential information for an improper purpose. *See* SPA16 (citing *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 456 (S.D.N.Y. 2015)); *accord Dirks v. SEC*, 463 U.S. 646, 660–62 (1983). A plaintiff must also allege that "the tippee kn[ew] the information was disclosed [to it] in breach of the

21

tipper's duty, and [that] the tippee" traded on the information "in disregard of that knowledge." *Salman*, 580 U.S. at 42. The SAC is missing *all* of these essential elements.

### A. Plaintiffs Fail to Allege that Archegos Owed a Duty to the Issuers

Plaintiffs fail to identify any legal duty that Archegos owed to the issuers. SPA34. As the district court correctly reasoned, "the obligation to maintain the corporation's confidences derives from the 'existence of a relationship affording access to insider information intended only to be available for a corporate purpose.'" SPA35 (quoting *Chiarella v. United States*, 445 U.S. 222, 227 (1980)); *see also Dirks*, 463 U.S. at 657–58 (reaffirming that an insider trading duty of confidence "'arises from the relationship between the parties . . . and not merely from one's ability to acquire information because of his position in the market'" (quoting *Chiarella*, 445 U.S. at 231–32 n.14)). "[W]hether a shareholder is an insider is circumstantial, and can depend on the specific facts of a situation." SPA17 (citing *Gruber v. Gilbertson*, No. 16-CV-9727, 2021 WL 2482109, at *14 (S.D.N.Y. June 17, 2021)).

"The basis for recognizing [the] fiduciary duty [of a temporary insider] is not simply that such persons acquired nonpublic corporate information, but rather *that they have entered into a special confidential relationship [with the corporation] and are given access to information* solely for corporate purposes."

22

*Dirks*, 463 U.S. at 655 n.14 (emphasis added). "For such a duty to be imposed, however, *the corporation must expect the outsider to keep the disclosed information confidential*, and the relationship at least must imply such a duty." *Id.* (emphasis added).

Courts have accordingly considered shareholders to be insiders when they have a special relationship with a corporation that affords access to the corporation's confidential information or control over the corporation's affairs. *See* SPA35; *see also, e.g.*, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 n.5 (2d Cir. 2014) (controlling shareholders are insiders because "they have the same sort of access to information . . . as the typical officer and director" (citation and internal quotation marks omitted)); *Sawant v. Ramsey*, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (shareholder not an insider where he "did not participate in the development, marketing or business planning," was not a consultant or advisor, and only conversed with the company in his capacity as a shareholder); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18 C 6175, 2020 WL 60186, at *12 (N.D. Ill. Jan. 6, 2020) ("[M]inority shareholders do not acquire insider status, even if they have a member on the Board, unless they exercise control over the corporation's affairs.").

In contrast, plaintiffs allege that Archegos had *no relationship at all* with the issuers, and that "no one," including the issuers, knew about Archegos's swap

23

exposures to the issuers' stocks. A320 ¶ 100. The information that Archegos purportedly shared with defendants was *not sourced from the issuers*, much less in the context of a special relationship. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 13–14 (2d Cir. 1983) (no duty where "the complaint contains no factual assertions that [defendants] received *any* information" from target). Thus, the issuers had *no possible expectation* of confidentiality from Archegos. *Dirks*, 463 U.S. at 655 n.14; *see also* SPA36 ("This was not a relationship affording access to inside information intended to be available only for a corporate purpose." (quoting *Chiarella*, 445 U.S. at 227)).

As the district court correctly determined, Archegos "enjoyed none of the control or access typically afforded to controlling shareholders." SPA36. "It could not vote its shares, had no contact with the Issuers, had no access to the Issuers' confidential information, and did not influence corporate affairs." *Id.* Its alleged control was limited to the ability to indirectly effect the issuers' share prices at certain times through its derivative exposures. *Id.*; A320 ¶ 100. Those types of allegations alone have *never* been sufficient to support an insider trading duty. *See, e.g.*, *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 122, 126–27 (S.D.N.Y. 2004) (analyst's alleged secret trading after issuing misleading stock opinions to further alleged pump-and-dump scheme did not qualify as insider trading); *see also Feldman v. Simkins Indus., Inc.*, 679 F.2d 1299, 1303–04 (9th

24

Cir. 1982) (allegations that shareholder's public statements artificially inflated stock price did not make him insider where he had no insider access), *overruled in part on other grounds by In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 823 F.2d 1349 (9th Cir. 1987); *see also* SPA35. An alleged ability to influence prices in the stock market is insufficient to confer insider status because it is wholly divorced from the essential element of any insider trading violation: "the existence of a relationship affording access to insider information intended to be available only for a corporate purpose." *Dirks*, 463 U.S. at 653; *see* SPA35–36.

Despite these deficiencies, plaintiffs insist that Archegos should be viewed as an insider of the issuers because its large swap exposures effectively made it "a controlling shareholder." App. Br. 12–13. Plaintiffs' theory appears to assume that because defendants (and Archegos's other counterparties) allegedly hedged the swap positions by buying actual shares of the underlying stocks, Archegos was the true "beneficial owner" of those shares. App. Br.44–46; A301–02 ¶¶ 40–42, A318 ¶ 94, A334 ¶ 123, A378 ¶ 261. But the SAC is hopelessly contradictory on this point and cannot be credited. Plaintiffs allege that the actual shares were held by *defendants* as hedges, that the hedges were "proprietary" to defendants and "distinct from Archegos's shares," that defendants independently selected this hedging strategy from among many possible strategies, that defendants purchased the hedges "on their own," without Archegos's involvement, and that defendants

would sell their hedges if Archegos defaulted on its swaps.[7]  A302–03 ¶¶ 41, 45–46, A343 ¶ 153.  If, as plaintiffs allege, the actual shares were controlled by defendants, there is no support for plaintiffs' conclusory suggestion that Archegos was equivalent to a controlling shareholder.

In stark contrast to this case, the controlling shareholder cases plaintiffs rely on involved quintessential insiders who actually owned shares (not derivative positions) and were actively involved in directing the business or received inside information.  App. Br. 34, 37, 38, 47; *see, e.g.*, *Gruber*, 2021 WL 2482109, at *14 (holding shareholders "possessed power over corporate affairs" where they "were part of the day-to-day business," involved in appointing officers, and "directed financial decisions"); *Crane v. Westinghouse Airbrake Co.*, 419 F.2d 787, 796 (2d Cir. 1969) (deeming large shareholder an insider because it was "acting in concert with the . . . management" of the corporation and regularly communicating with them about an upcoming merger); *see also Reed v. Riddle Airlines*, 266 F.2d 314, 315 (5th Cir.1959) (holding that issuer's president and general manager owed fiduciary duties by virtue of his position and the knowledge he acquired in his role

---

[7]    As plaintiffs allege, Archegos convened the forbearance call among its counterparties to "thwart a large scale liquidation" upon its default, A343 ¶ 153, and the vast majority (all but 5% at most) of Archegos's positions were swaps, A318 ¶ 94, A334 ¶ 123.  The "large scale" sell-off that Archegos expected obviously included the hedges, which "mirror[ed] Archegos's [swap] positions" so that its counterparties could remain "market-neutral."  A334 ¶ 123, A378 ¶ 261.

"as an 'insider'"); *Rogen v. Ilikon Corp.,* 361 F.2d 260, 263–66 (1st Cir. 1966) (involving founders of issuer who allegedly purchased stock without disclosing issuer's licensing negotiations).

In a last-ditch effort, plaintiffs assert that Archegos was an insider because its derivative positions qualified it as a "statutory insider" under Sections 16(b) and 13(d) of the Exchange Act, App. Br. 45, 47–48—a proposition the district court rejected in granting the first motion to dismiss, SPA16 n.6, and that plaintiffs had largely abandoned below, *see* A454. Section 16(b) speaks to "insider" status for purposes of the short-swing trading profits rule, and applies to investors who beneficially own more than 10% of an issuer's stock, 15 U.S.C. § 78p(b). Even assuming that Archegos were subject to this statutorily created duty to disgorge any short-swing profits, that duty is not the fiduciary or other similar duty of *trust and confidence* that is required for an insider trading claim. *See* SPA16 n.6. The statutory duty created by "Section 16(b) does not itself proscribe trading on inside information" and "depends not on whether the [beneficial owner] traded on inside information"; it applies only to the limited "extent of making all short-swing transactions by such persons in the issuer's stock 'breaches of trust." *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 174, 177 (2d Cir. 2012). In other words,

the content of the duty is simply "to refrain from engaging in any short-swing trading," *id.* at 177, a duty plaintiffs do not allege was violated here.[8]

Nor does plaintiffs' theory find any support in their reliance on the ownership reporting requirements in Section 13(d). App. Br. 48. As the cases cited by plaintiffs make clear, Section 13(d) creates a regulatory disclosure requirement that is not enforceable for damages by any private plaintiff, whether the issuer itself or its shareholders. *See, e.g.*, *Hallwood Realty Partners, L.P. v. Gotham Partners L.P.*, 286 F.3d 613, 619–20 (2d Cir. 2002) (observing that "[c]ourts in this circuit have consistently declined to imply a cause of action for shareholders under § 13(d)," and holding that "there is no private damages remedy for issuers under § 13(d)" either). Reporting obligations do not equate to a fiduciary duty of trust and confidence. *See Wellman v. Dickinson*, 682 F.2d 355, 367 (2d Cir. 1982) (holding that director's violation of Section 13(d) "placed him

---

[8]    As this Court explained in *Donoghue*, while trading on inside information was "the wrongdoing that prompted the enactment of § 16(b)," the statute does not turn on actual insider trading, as it "operates without regard to whether the statutory fiduciaries were actually privy to inside information." 696 F.3d at 177. Plaintiffs' contention that statutory insiders are "presumed" to have access to inside information as a matter of law is thus baseless. *See* App. Br. 45. In fact, *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232 (1976), cited by plaintiffs, proves the point. As the Supreme Court there explained, insiders are generally presumed to have access to inside information "because of their intimate involvement in corporate affairs." *Id.* at 253. Here, the allegations in the SAC contradict any such presumption.

under no fiduciary duty" to disclose his trading plans "to the company's management"). None of plaintiffs' authorities suggests that a Section 13(d) obligation can support an insider trading claim. Having failed to plead any duty, plaintiffs fail to state a claim.

### B. Plaintiffs Fail to Allege that Archegos Tipped Inside Information in Breach of Any Duty to the Issuers

As the district court correctly determined, plaintiffs also fail to allege that Archegos tipped defendants with inside information, which independently dooms their claims. SPA33–35. Plaintiffs' tippee theory of insider trading disregards controlling Supreme Court and Second Circuit precedent holding that tippee liability requires the passing of "*inside corporate information* by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." *Salman*, 580 U.S. at 41 (emphasis added). Plaintiffs do not allege that Archegos shared or even possessed any of the issuers' inside information, let alone information entrusted by virtue of a special confidential relationship. Rather, as the district court held, the SAC makes clear that the information allegedly tipped by Archegos "was Archegos's own information resulting from its own trading with defendants." SPA34; *see also* A331–33 ¶ 118.

As an initial matter, it is axiomatic that a party's sharing its own information with another cannot be the basis for an unlawful tippee claim. *See* App. Br. 41

29

(claiming that "Archegos had a personal property right of exclusive use" to the information it provided defendants).  As the Supreme Court and this Court have explained, the logic behind tipping being a breach of duty is that "[a] firm's confidential information belongs to the firm itself, and an insider entrusted with it has a fiduciary duty to use it only for firm purposes."  *Martoma*, 894 F.3d at 73; *United States v. O'Hagan*, 521 U.S. 642, 654 (1997) (explaining that insider trading is "akin to embezzlement because [a] company's confidential information qualifies . . . as property to which the company has a right of exclusive use").

    The very "fraud" that makes trading on an insider tip actionable under Section 10(b) "derives from the 'inherent unfairness involved where one takes advantage' of 'information intended to be available only for a corporate purpose.'" *Dirks*, 463 U.S. at 654 (citation omitted); *see also* SPA33.  A direct consequence of this reasoning is that when one transmits its own information for its own purposes, there is no unlawful tipping, and the recipients of that information acquire no derivative duty to disclose or abstain.  *See, e.g.*, *Martoma*, 894 F.3d at 73 (no insider trading liability where corporation's information is "disclose[d] for a legitimate corporate purpose," even if that information was used for trading); *Dirks*, 463 U.S. at 663 (same).  That is all plaintiffs allege occurred here.

    While the SAC is vague and conclusory in describing the alleged MNPI, it *does* make clear that all of the supposed inside information that Archegos shared

30

with defendants *originated from and was about Archegos*. As plaintiffs describe it, the confidential information allegedly pertained to the swap positions that Archegos held with each defendant, as well as Archegos's own liquidity and capital. SPA34 (citing A331–33 ¶ 118); *see also* A289–90 ¶¶ 5–6, A306 ¶¶ 59–60, A331–33 ¶ 118, A334–36 ¶ 125, A338–39 ¶¶ 132–34. The SAC likewise confirms that Archegos provided that information to defendants to comply with its contractual obligations and for its own corporate purposes, "in the course of" receiving brokerage services, and "through . . . [defendants'] respective . . . agreement[s] and contractual relationship[s] with Archegos." A330 ¶ 117. Defendants are not aware of any case in which the original source or owner of the confidential information was deemed a tipper for sharing its own information for its own corporate purposes.[9]

Plaintiffs' tippee claims fail because there is no suggestion that Archegos disclosed any corporate information of the issuers in violation of any duty to them. *See, e.g.*, *Salman*, 580 U.S. at 42 (explaining that "a tippee's liability for trading on inside information hinges on whether the tipper breached a fiduciary duty by disclosing the information"); *Dirks*, 463 U.S. 659 (forbidding insiders from

---

[9]   Indeed, under plaintiffs' theory, broker-dealers would be unable to engage in trading to hedge swap positions, which plaintiffs themselves acknowledge is "industry standard." A302 ¶¶ 41–42, A334 ¶ 123, A378 ¶ 261.

"personally using *undisclosed corporate information* to their advantage" or giving

it "to an outsider for the same improper purpose of exploiting the information for

their personal gain" (emphasis added)). Plaintiffs in fact concede that the allegedly

confidential information here was "entirely unknown to the Issuers," SPA34 (citing

A320 ¶ 100, A331–33 ¶ 118), as opposed to inside corporate "information acquired

or compiled by [the issuers] in the course and conduct of [their] business[es],"

*Carpenter v. United States*, 484 U.S. 19, 26 (1987) (explaining that such

information is "property to which the corporation has the exclusive right and

benefit" (citation and internal quotation marks omitted)). Thus, as the district court

correctly held, "[a]s it was not the Issuers' information, Archegos breached no duty

to the Issuers by sharing the information with defendants." SPA34.

Indeed, even assuming that Archegos owed and breached some duty to the

issuers, plaintiffs still fail to allege any facts to support the conclusion that

*defendants knew* Archegos had illegally tipped them by sharing its own

information with them. *See Salman*, 580 U.S. at 42. Plaintiffs do not, for example,

allege that Archegos shared any information with defendants from which they

might have inferred that it was using swaps—a common and legal investment

instrument—to evade regulatory reporting rules or to engage in market

manipulation. *See supra* at 9–10; SPA7; *see also ATSI Comm'cns, Inc. v. Shaar

Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) (holding that short selling, another

lawful investment instrument, "even in high volumes[,] is not by itself manipulative").

Unable to reconcile their tippee theory with fundamental insider trading law, plaintiffs resort to arguing that the district court erroneously redefined MNPI to exclude information that does not belong to the issuer whose stock is the subject of the alleged insider trading. App. Br. 32–42.[10] The district court did no such thing. Plaintiffs' argument on this score ignores the distinction between the *misappropriation* tippee theory, under which the tippee receives market information potentially unknown to the issuer but owned by others, and the *classical* tippee theory (on which the SAC relies), where the issuer's own confidential information is used for trading. Plaintiffs also disregard the fundamental tenet of insider trading liability, which is that the information in question must be passed in violation of the tipper's duty of trust and confidence.

---

[10] Plaintiffs accuse Judge Rakoff of playing "a game of telephone," claiming that he used out-of-context snippets from cases that did not "define the exact contours of MNPI," including allegedly misciting his *own opinion.* App. Br. 39 & n.4 (citing *United States v. Pinto Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018). But the district court did not purport to redefine all MNPI or rely solely on its own opinion. Rather, the court correctly quoted statements by the Supreme Court referring to "[a] company's confidential information . . . as property to which the company has a right of exclusive use" and describing the misappropriation of such information as embezzlement. *O'Hagan*, 521 U.S. at 654; *see also Carpenter*, 484 U.S. at 26 ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit."); *see generally* SPA37–38.

*See Salman*, 580 U.S. at 41–42. Plaintiffs' contention that some market information can be material and nonpublic even when it does not come from an issuer thus misses the point, because an insider trading "duty does not arise from the mere possession of nonpublic market information." *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir. 1991) (quoting *Chiarella*, 445 U.S. at 235); *accord* SPA11. Even if the information Archegos purportedly shared constituted confidential information (and, as the district court determined, it did not, SPA30), it has no bearing on the relevant question: whether it was shared in violation of a duty owed to the issuers, SPA34.[11]

This fundamental flaw in plaintiffs' theory is illustrated by their reliance on out-of-date cases and sources leading up to or pre-dating the recognition of the misappropriation theory. App. Br. 34–38. For example, plaintiffs cite this Court's

---

[11] For similar reasons, plaintiffs' repeated citations to the SEC's order in *In re Oppenheimer & Co.*, SEC Release No. 508, 1976 WL 160384 (SEC Apr. 2, 1976), is unavailing. *See* App. Br. 34, 35, 44. That order—which is all of two paragraphs long and predates the Supreme Court's decisions in *Chiarella* and *Dirks*— recognized in dictum that "'market information' can be the basis of antifraud violations," but dismissed such claims against the respondent as unsupported. *Id.* It adds nothing to the question of whether Archegos unlawfully tipped its *own* information. Likewise misplaced is plaintiffs' contention that SEC Rule 10b5-1 extends insider trading liability beyond the use of internal corporate information. App. Br. 32. As Rule 10b5-1 itself provides, trading on such information violates Section 10(b) and Rule 10b-5 only when it is "in breach of a duty of trust or confidence" to the issuer, its shareholders or the source of the information. 17 C.F.R. § 240.10b5-1(a). Plaintiffs' failure to allege the existence or violation of any such duty here precludes their claims.

decision in *Chiarella* for the proposition that insider trading can be based on external market information, including "'that a large shareholder is seeking to unload his shares.'" App. Br. 34 (quoting *United States v. Chiarella*, 588 F.2d 1358, 1365 n.8 (2d Cir.), *rev'd*, 445 U.S. 222 (1980)). But that decision was reversed precisely because the defendant "received no confidential information from the [] company" and was "not a corporate insider" of that company. *Chiarella*, 445 U.S. at 231.[12] Indeed, the other financial printer and newspaper tipping cases plaintiffs cite would be analyzed today under the misappropriation framework based on the employees' duty to their employers—*not* the issuers whose securities they traded. App. Br. 36 (citing cases); *see also United States v. Carpenter,* 791 F.2d 1024, 1026 (2d Cir. 1986) (finding that employee of newspaper breached a duty of confidentiality to his employer by tipping information about other companies that he learned in the course of his employment), *aff'd in part and aff'd by an equally divided court in part*, 484 U.S. 19 (1987).

---

[12] Later, when formally recognizing the misappropriation theory, the Supreme Court indicated that *Chiarella* might have been upheld on a misappropriation theory. *O'Hagan*, 521 U.S. at 661–62. But that has no bearing here, where the SAC fails to allege any misappropriation by Archegos or defendants. *See infra* Point II.

Similarly inapposite is the supposedly "seminal" 1979 law review article that plaintiffs quote for the proposition that "market information" need not be sourced (or known to) an issuer to support an antifraud violation. App. Br. 37 (citing Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv. L. Rev. 322, 330 (1979)). That concept has nothing to do with the insider trading claims asserted in this case. And while plaintiffs note that this article was cited favorably by *O'Hagan*, 521 U.S. at 659, they ignore that the Supreme Court referenced it solely for a different proposition in the course of recognizing the *misappropriation* theory of insider trading—not the classical tipping theory that plaintiffs have pursued below and in this Court. In any event, to the extent that article suggested that a classical tipping claim could be based on "market information" external to an issuer, the Supreme Court rejected that premise in *Dirk*s, directly repudiating the article's thesis "that all traders must enjoy equal information before trading." 463 U.S. at 657; *see also Chiarella,* 445 U.S. at 231–32 (rejecting the view that "[*a*]*nyone*—corporate insider or not—who regularly receives material nonpublic information" acquires "an affirmative duty to disclose" (citation and internal quotation marks omitted)). Because plaintiffs have failed to plead a viable tipping claim under controlling insider trading law, this Court should affirm the dismissal.

## II. The District Court Correctly Determined that Plaintiffs Did Not Allege Any Claim Under the Misappropriation Theory of Insider Trading

The district court also correctly held that plaintiffs failed to allege any claim under their alternative, "misappropriation" theory of insider trading. SPA37–40. Under the "misappropriation theory," a person who is not an insider may commit insider trading by making use of confidential information "in breach of a duty of loyalty and confidentiality" to a third party who supplied it, thereby "defraud[ing] the principal of the exclusive use of the information." *O'Hagan*, 521 U.S. at 652. As both district court judges determined, the core, immutable facts alleged here— that defendants closed out their arm's-length contractual relationships with Archegos, did not agree to Archegos's request to refrain from exercising their contractual rights to trade, and traded only with Archegos's consent or with notice after its default—do not support a misappropriation claim. SPA10–15, 29, 37–40.

### A. Plaintiffs Fail to Allege that Defendants Owed or Breached Any Duty to Archegos

The district court properly determined that plaintiffs failed to allege that Archegos provided defendants with confidential information, or that defendants otherwise owed or breached any duty to Archegos not to trade. SPA37–40.

None of the information that Archegos allegedly provided to defendants on March 24 and 25 constituted confidential information "generated and maintained for [Archegos's] 'exclusive right and benefit.'" SPA37–38 (citing *Carpenter*, 484

37

U.S. at 26).[13]  Plaintiffs contend that Archegos provided defendants with MNPI when it (1) told them that it could not meet their anticipated margin calls on March 24 and (2) shared information with its counterparties about its equity and gross exposure on a conference call it organized on March 25.  App. Br. 51 (citing A342–43 ¶¶ 150, 153).  But plaintiffs cannot transform information that Archegos supplied pursuant to its contractual obligations, or in a voluntary effort to persuade defendants *not* to exercise the contractual rights that Archegos understood they could and would exercise, into confidential information that somehow obligated defendants not to engage in trading.

As plaintiffs themselves allege, defendants had the contractual right to liquidate their positions in the event Archegos defaulted by missing a margin call. A339–40 ¶ 139, A343 ¶ 153–54, A352–53 ¶¶ 180–81, *supra* 25–26 n.7.  In other words, the information that Archegos would fail to meet its margin calls could not possibly be for Archegos's exclusive use, as defendants were contractually entitled to that information (and to trade upon it).  SPA38 (citing A343 ¶ 154).

Unable to meet its margin obligations, Archegos allegedly sought to "thwart a large scale liquidation" by organizing a conference call to request that its counterparties forbear from selling.  A343 ¶ 153.  As the SAC makes clear, and as

---

[13]  Plaintiffs concede that the alleged trades on or after March 26 were lawful. App. Br. 52.

both district court judges held below, "the very fact that Archegos convened a meeting to ask defendants not to trade demonstrates that Archegos understood that defendants could and would sell absent such an agreement"—an agreement which plaintiffs concede was never consummated. SPA38; *see also* SPA18. The district court therefore correctly held, twice, that no duty to abstain from trading arose from receiving information that Archegos voluntarily provided. This conclusion is not an "improper inference on [d]efendants' behalf," App. Br. 53, but an inescapable conclusion of plaintiffs' own allegations, *see, e.g.*, *Martin v. Quartermain*, 732 F. App'x 37, 41 (2d Cir. 2018) (finding that the "facts [alleged in the complaint] defeat[ed] [the] inference" plaintiffs proposed).

In contrast, plaintiffs' proposed inference—that Archegos considered the information about its gross exposure confidential because it had a "history, pattern, [or] practice" of withholding that information, App. Br. 54—is flatly contradicted by both the SAC and plaintiffs' arguments below, *see* A443, A447; *see also* A463 (asserting that SAC alleges that the conference calls merely "confirmed the large size of Archegos's beneficial holdings"); A331–33 ¶ 118 (alleging that Archegos historically provided defendants with information about its large ownership stakes across the issuers); A339–40 ¶ 139 (alleging that Archegos informed defendants during week of March 22 that it was having difficulty and ultimately could not meet margin calls). The SAC supplies no grounds to support plaintiffs' naked

assertion that any policies or practices imposed a duty of confidentiality preventing defendants from exercising their contractual rights to trade. App. Br. 54; *see Noto v. 22nd Century Grp.*, 35 F.4th 95, 104 (2d Cir. 2022) ("[M]ere conclusory statements . . . are insufficient to state a claim" (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1311 (2d Cir. 2002) ("Courts therefore have sensibly declined to infer legal duties from internal 'house rules' or industry norms.").

Even assuming Archegos considered the information it shared confidential, plaintiffs do not allege the necessary "agreement or understanding" required to impose a duty of confidence on the arm's-length counterparty relationship between defendants and Archegos. *See Moss*, 719 F.2d at 14 (explaining that investment bank "did not become the [counterparty's] fiduciary simply upon receipt of confidential information" in the course of "arm's length bargaining" with it (discussing *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980))); *see also Chestman*, 947 F.2d at 567 ("[A] fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information.").[14] Here, the

---

[14] "[T]here is no general fiduciary duty inherent in an ordinary broker/customer relationship." *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998); *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) ("[I]n the context of an ordinary broker-client relationship, the broker owes no fiduciary duty to the purchaser of the security."); *accord XY Planning Network LLC v. S.E.C.*, 963 F.3d 244, 247 (2d Cir.

*(cont'd)*

40

only purported restriction allegedly agreed to was that "none of [the counterparty broker-dealers] were permitted to disclose their specific Archegos related positions" to one another. App. Br. 54 (citing A344 ¶ 156). Plaintiffs' contention that "the brokers explicitly contemplated circulating an NDA [non-disclosure agreement] amongst the parties prior to discussing the full extent of their positions . . . on the call," App. Br. 17, is newly raised on appeal and finds no support in the SAC. But even then, plaintiffs do not claim that any such agreement was signed or that positions were discussed, only that Archegos provided information about its gross exposure and equity.

Moreover, fiduciary relationships imposing a duty of confidentiality "are marked by the fact that a party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information." *United States v. Falcone*, 257 F.3d 226, 234–35 (2d Cir. 2001). Here, plaintiffs allege the exact opposite: that defendants acted as counterparties and lenders who, as in any arm's-length transaction, took steps to protect their own interests over the course of their arm's-length relationships, including—ultimately—by declaring default and liquidating their positions. A298

2020) ("Under federal law, investment advisers owe a fiduciary duty to their clients, but broker-dealers do not."); *United States v. Litvak*, 889 F.3d 56, 61 (2d Cir. 2018) ("A broker-dealer is not, therefore, an agent for its counterparties in these [bond] trades and owes them no special or fiduciary duty.").

41

¶¶ 25–26 (alleging swap and margin lending relationships); A331–32 ¶ 118 (alleging that defendants raised margin and other requirements to make transacting more expensive for Archegos to protect themselves as exposures increased); A352–53 ¶¶ 180–83 (alleging that defendants exercised early termination rights and liquidated after Archegos failed to meet its contractual margin obligations).

Finally, even if plaintiffs had alleged the requisite duty (which they did not), the only trading by defendants identified by the SAC on March 24 and 25 were trades allegedly arranged by defendants at Archegos's direction and with its knowledge. A341–42 ¶¶ 146, 151, A352 ¶¶ 178–79, A360–61 ¶¶ 205–06; A452; App. Br. 56–57. As the district court twice held, this admission eviscerates plaintiffs' claims because trading that has been disclosed to the principal is not deceptive—and therefore not actionable—as insider trading. SPA38 (citing *O'Hagan*, 521 U.S. at 654); SPA13–14.

## B. Plaintiffs Fail to Allege that Defendants Tipped Archegos's Confidential Information to Customers

As both district court judges held below, there are no well-pleaded facts supporting the claim that defendants misappropriated Archegos's information by tipping unnamed preferred clients about Archegos's block trades. SPA13 n.5, 39–

40.  Plaintiffs cannot overcome their failure to state a claim by wrongly insisting that they were held to a "super-heightened pleading standard."  App. Br. 54–55.

Plaintiffs complain that they "need not plead dates, times, and places with absolute precision," App. Br. 55, but they have not pleaded *any tips, tippees, or trades connected with any tips whatsoever*, let alone with any particularity, *see ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Plaintiffs assert that they "are not required to allege information" in defendants' exclusive possession.  App. Br. 56.  But their cited standard (even if it were applicable) is only "'relaxed' to allow circumstantial evidence to plead the specific content and circumstances of insider tips," and must still "be accompanied by factual allegations that provide substantiation and make them plausible."  *S.E.C. v. Alexander*, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001) (cited by *SEC v. Afriyie*, No. 16-CV-2777 (JSR), 2018 WL 6991097, at *2 (S.D.N.Y. Nov. 26, 2018)).  That is precisely what the district court held plaintiffs failed to do here.  *See* SPA13 n.5, 40.

Plaintiffs' allegations in support of this theory are that (1) trading volumes increased for the seven issuers on March 24, 2021, relative to their first quarter 2021 averages; (2) the stock price of one of the seven issuers (Discovery) allegedly declined before Morgan Stanley allegedly priced block trades involving that stock on March 24 and 25, which, according to plaintiffs' say-so, are "tell-tale sign[s] of

43

front-running"; (3) a Morgan Stanley employee "oversaw" the Discovery trade on March 25; and (4) news articles, which do not mention Archegos or the issuers relevant to these cases, reported that the Morgan Stanley employee was later terminated for failing to cooperate in connection with a block trading investigation. App. Br. 56; A293 ¶ 15, A309–13 ¶¶ 70–77, A360–63 ¶¶ 205–14, A373 ¶¶ 248–50.  Even if true, the alleged volume increases and price decline are explained by plaintiffs' *own* allegations that the issuers' stock prices were responding negatively on March 24 to a stock offering and the announcement of new anti-China regulations, A341 ¶¶ 144-45, and that Archegos simultaneously "directed hundreds of millions of dollars of additional trading in those same positions," knew about block trades executed by defendants that same day, and itself directed defendants to arrange billions of dollars in block trades on March 25.  A341–42 ¶¶ 146, 151, A352 ¶¶ 178–79; A452; *accord* SPA40.  As the Supreme Court has made clear, these types of allegations, which are just as consistent with lawful conduct, do not satisfy even the basic plausibility standard of Rule 8(a), much less the particularity requirements of Rule 9(b) that governs insider trading allegations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (allegations of parallel conduct in antitrust context, without more, does not suggest unlawful conspiracy).[15]

---

[15]  Plaintiffs contend that defendants "breached their duty to Archegos by beginning to trade Archegos positions **on March 24, 2021**," before Archegos

*(cont'd)*

The district court properly declined to make the unjustified supposition "that because trading volume increased and because stock prices fell, it must be because defendants tipped some unidentified preferred clients, who in turn made unidentified trades on the tip." SPA40. That is not a logical inference, it is speculation. The inference plaintiffs urged the district court to adopt was "entirely at odds with [their] own allegations," unsupported by "particular factual allegations" making them plausible, and could be reached only through "an entirely conjectural leap." *Id.*; *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (complaint dismissed for failure to meet Rule 9(b) standard where, among other things, there was "nothing in the complaint that link[ed]" allegations about revenues "to plaintiffs' claim that the financial projections . . . [we]re false").

The cases that plaintiffs cite, by contrast, are readily distinguishable because they involved inferences supported by precisely the type of well-pleaded factual

---

defaulted, "on the basis of the MNPI they learned that day," App. Br. 52 (emphasis in original), but this assertion is devoid of any alleged factual support. Plaintiffs do not even identify what purported trading they are referring to. To the extent they mean the alleged block trades that day, there is no allegation that Archegos did not direct such trades or that they were contrary to Archegos's instructions, and plaintiffs conceded below that Archegos knew about them. A452. Nor do plaintiffs identify any confidential information provided to defendants on March 24, as the SAC affirmatively alleges that Archegos did not begin sharing the news that it could not meet their anticipated margin calls on March 25 until "[a]fter the market closed on March 24." A342 ¶ 150. And plaintiff's only supporting citation to the record—page A360 of the Joint Appendix—contains the same vague and conclusory tipping allegations that are fully addressed above.

allegations that the SAC lacks. *See, e.g.*, *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146–47 (2d Cir. 2021) (plaintiff's proposed inference was not only "plausible" but also consistent with and supported by numerous detailed allegations in the complaint); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169–70 (2d Cir. 2021) (district court's inference was reversed because it was contrary to specific and well-pleaded factual allegations in complaint); *Rothman v. Gregor*, 220 F.3d 81, 91–92 (2d Cir. 2000) (plaintiffs plausibly alleged that money was unlikely to be recouped through sales by pointing to allegations about poor sales, the company's own statements that products were not commercially viable, and an expensive write-off).[16] Unlike in those cases, plaintiffs' allegations fall well short of satisfying the heightened particularity requirements with which a purported insider trading scheme must be alleged. *See, e.g.*, *In re FBR Inc. Secs. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008).

This Court should reject plaintiffs' improper attempt to make up for their implausible allegations by asserting that the district court's ruling conflicts with slices of out-of-context testimony from *United States v. Sung Kook Hwang &*

---

[16] Plaintiffs mischaracterize *Indiana Public Retirement System v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016). This Court did not hold that the district court "misconstrued facts pled in the complaint," App. Br. 58, but rather that the district court had failed to apply a particular probability standard applicable to claims under a particular Financial Accounting Standard. *Id.* at 93–94.

*Patrick Halligan*, No. 22-cr-240 (S.D.N.Y.). *See* App. Br. 51–54, 57–58. For all the reasons set forth in defendants' briefs in opposition to plaintiffs' motion for judicial notice and in support of defendants' motion to strike, *see* ECF Nos. 24.1, 30.1, the Court cannot and should not take notice of these excerpts and should strike them from the record, *see Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 n.4 (2d Cir. 2012).

Even if the snippets of vague testimony plaintiffs seek to introduce were considered, it would make no difference because none of them suggests that defendants owed or breached any duty to their arm's-length counterparty not to trade. Far from "corroborat[ing]" the frontrunning allegations, *see* App. Br. 57–58, plaintiffs' cherrypicked testimony excerpts indicate only: that Goldman Sachs and another Archegos counterparty expressed disappointment at the speed at which Archegos was voluntarily liquidating its positions, *see* ECF 21.1 at ECF pp. 4, 45–46, 49; that Archegos's counterparties acted on March 26 in a manner consistent with their contractual rights, *see id*. at ECF pp. 3, 17; and that prior to March 26, an Archegos employee wondered whether Archegos's counterparties were already exercising their contractual rights, *see id*. at ECF pp. 4, 22. None of these allegations improves upon plaintiffs' "entirely conjectural leap" that price declines in the issuers' stocks indicate "improper unidentified trading by defendants' unidentified tippees." SPA40. Similarly, testimony that Archegos disclosed to its

counterparties on March 24 that it would not be able to meet margin calls on March 25, ECF 21.1 at ECF pp. 4, 35–37, and that it did not disclose the specifics of its positions with any given counterparty to its other counterparties, *id*. at ECF pp. 4, 20–21, 28, does nothing to save plaintiffs' claims that defendants somehow owed Archegos a duty of trust and confidence not to trade on the generalized information Archegos voluntarily provided. The district court's dismissal of their misappropriation claims should accordingly be affirmed.

**III.    The District Court Properly Dismissed Plaintiffs' Claims Under Sections 20A and 20(a) Because Plaintiffs Failed to Plead Any Primary Violation**

The District Court properly dismissed plaintiffs' claims under Section 20A and Section 20(a) of the Exchange Act because, for the reasons set forth above, plaintiffs failed to plead any predicate violation of Section 10(b) and Rule 10b-5. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 152 (2d Cir. 2021) ("Actions under either section [20(a) or 20A] require an independent violation of the Exchange Act.") (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994)); *see also City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 491 (S.D.N.Y. 2021) (dismissing Section 20(a) and 20A claims "[b]ecause Plaintiffs have failed [to] state a claim for a violation of section 10(b)").

48

## CONCLUSION

For the reasons stated herein, the judgment below should be affirmed.

Dated:  New York, New York
         November 6, 2024

Respectfully submitted,

**DAVIS POLK & WARDWELL LLP**

By: /s/ *Charles S. Duggan*
Charles S. Duggan
Daniel J. Schwartz
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
charles.duggan@davispolk.com
daniel.schwartz@davispolk.com

*Counsel for Defendant Morgan Stanley*

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

By: /s/ *Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
cboccuzzi@cgsh.com

*Counsel for Defendant Goldman Sachs Group, Inc.*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with the Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 11,786 words as calculated by Microsoft Word, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
       November 6, 2024

**DAVIS POLK & WARDWELL LLP**

By: */s/ Charles S. Duggan*
Charles S. Duggan
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
charles.duggan@davispolk.com